ATTORNEY FOR APPELLANTS
Steven K. Huffer
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
PACIFIC LEGAL FOUNDATION
F. Bradford Johnson
Indianapolis, Indiana

Scott M. Dutcher
Sacramento, California

ATTORNEYS FOR APPELLEE
BAA INDIANAPOLIS, LLC
Nelson Nettles
Richard Norris
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANAPOLIS AIRPORT AUTHORITY
Edward W. Harris, III
Scott R. Alexander
Michael D. Chambers
Indianapolis, Indiana

# In the
# Indiana Supreme Court

_____

No. 32S05-0602-CV-33

ANDREW BIDDLE, JEANETTE BIDDLE,
TODD FAKES, ROSALYN FAKES,
TAMMY GARDNER, WILLIAM GARDNER,
BRENDA JAY, JEFFREY JAY, KHOUSAR KHEIRI,
ARIF KHEIRI, BRYAN MEYER, JUDITH MEYER,
RAYMOND SHANNON, SHERRY SHANNON,
CATHY SMILEY, AND ROBERT SMILEY,

Appellants (Plaintiffs below),

v.

BAA INDIANAPOLIS, LLC AND
INDIANAPOLIS AIRPORT AUTHORITY,

Appellees (Defendants below).

_____

Appeal from the Hendricks Superior Court, No. 32D01-0202-PL-15
The Honorable Matthew G. Hanson, Special Judge

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 32A05-0409-CV-505

_____

**January 23, 2007**

**Shepard, Chief Justice.**

Homeowners near Indianapolis International Airport contend that noise from airplanes passing over or near their property amounts to a taking within the meaning of the Fifth Amendment. The homeowners also say the Airport should be compelled to offer them financial settlements similar to those offered to earlier litigants. The trial court granted summary judgment for the Airport, and we affirm.

**Facts and Procedural History**

The Appellants ("Homeowners")[1] live in Hawthorne Ridge, a subdivision within three miles of Indianapolis International Airport. Indianapolis Airport Authority ("IAA"), a municipal corporation created by the City of Indianapolis, owns the Airport. BAA Indianapolis, LLC ("BAA") operates the Airport under a contract with IAA.

The Airport's Runway 5L-23R opened for aircraft operations in January 1996.[2] Aircraft departing from Runway 23R and landing on Runway 5L pass over or near Hawthorne Ridge, southwest of the Airport. Both large passenger jets and cargo aircraft, among others, use the runway. Landing aircraft fly about 1,300 to 1,500 feet above ground level as they pass Hawthorne Ridge. Departing aircraft fly 2,000 to 4,800 feet above the ground as they pass Hawthorne Ridge.

Obviously, these flights subject Hawthorne Ridge to aircraft noise. Many Homeowners claim the noise disturbs the use and enjoyment of their property by disrupting activities such as sleeping, talking, watching television or listening to the radio, hosting outdoor parties, reading, and opening windows. Some claim their property value has decreased between fifteen and thirty-three percent.

---

[1] The original plaintiffs were eight couples. By the time the Homeowners filed their Petition for Transfer, only the Fakes, Jays, Kheiris, and Shannons remained.
[2] Runways at airports are named for their magnetic headings. Each runway also has a dual name representing the two possible approach directions. For example, a runway named 23 has a magnetic heading of 230 degrees. The opposite direction is 50 degrees, corresponding to a name of 5. (Appellee's App. at 96-97.)

Addressing the impact of the Airport's operations on neighboring communities, IAA has elected to participate in three federal programs: the Sales Assistance Program, Sound Insulation/Purchase Assurance Program, and Guaranteed Purchase Program.[3] These programs cover nine residential developments. For example, sixty-one Hawthorne Ridge households have participated in the Sales Assistance Program. Under this scheme, IAA pays qualifying homeowners ten percent of the selling price of their home when it is sold to a third party. In return, homeowners agree to include a "Noise Disclosure Statement" in the deed of conveyance.

Homeowners allege that during public meetings in 1997 and 1998, representatives of IAA and BAA made statements about the Airport's policy for "dealing with the damage caused by excessive noise through financial settlement or otherwise." (Appellants' App. at 205.) These representatives indicated that the Airport would "treat neighbors alike" and would not "break up a neighborhood." (Id.) The representatives also made statements to the effect "IAA has a policy of not splitting neighborhoods" for the purposes of IAA's land use programs.[4] (Id. at 206.) None of the present Homeowners were present at these meetings.

In 1999, some forty residents of Hawthorne Ridge, not including these Homeowners, filed suit against IAA and BAA ("Backs lawsuit"). The parties settled on terms that included a $16,000 payment to each plaintiff in exchange for an "avigation" easement in favor of the Airport. The settlement also provided if the plaintiffs could not sell their homes for what the market price would be without airport influence, IAA would make up the difference or purchase the home.

---

[3] See 14 C.F.R. pt. 150 (2007). These regulations prescribe methods and procedures for planning and implementing airport noise compatibility programs.

[4] The Hendricks County Flyer published an article about a July 1997 public meeting in which IAA or BAA representatives apparently made such a statement. In relevant part, the article states:

> Other information disclosed at the meeting includes:
> . . . .
> The IAA has a policy of not splitting neighborhoods. If one part of the neighborhood falls in the 65 DNL the rest of the neighborhood is offered purchase assurance as well. Sycamore Estates is an example. Only four streets fall in the 65 DNL, but because of this policy, the whole neighborhood will be offered purchase assurance.

(Appellants' App. at 206-07.)

Homeowners sued IAA and BAA in 2001.  Homeowners asserted multiple claims, but withdrew many of them in the course of the hearing on the defendants' motions for summary judgment.  The trial court granted judgment to the defendants on those that remained: inverse condemnation, nuisance, and promissory estoppel.  On the inverse condemnation claim, the trial court concluded that Homeowners did not suffer a special injury and that the flights were too high to constitute a taking.  Relying on standard Fifth Amendment doctrine, it found that the flights did not cause "practical destruction" of the Homeowners' properties.  (Appellants' App. at 55-56.)  As for the promissory estoppel claim, the court found those Homeowners not present at the public meetings where promises were allegedly made could not maintain they received a promise.[5]

Homeowners left the nuisance claim behind and appealed only the inverse condemnation and promissory estoppel claims.  The Court of Appeals reversed and remanded for a trial on the merits.[6]  Biddle v. BAA Indianapolis, LLC, 830 N.E.2d 76 (Ind. Ct. App. 2005), vacated.  We granted transfer.[7]

## I.  Takings by Noise from Aircraft Flights

Homeowners claim they have shown that aircraft departing from and landing at the Airport effect a taking of Homeowners' properties by the noise the aircraft produce when they fly nearby.  Homeowners also claim to have shown they suffer a special injury in accordance with the requirements of our prior inverse condemnation cases.

---

[5] Homeowners argued before the trial court that third parties, other than the direct promisee, may assert a promissory estoppel claim in reliance on the same promise, even if the third parties were not present when the promise was made.  The trial court stated in its Conclusions of Law that it did not believe that "third parties can raise the claims in this case under promissory estoppel."  (Appellants' App. at 58.)

[6] The Court of Appeals affirmed dismissal of the Fakes' inverse condemnation claim, however, citing the "Noise Disclosure Statement" appearing in the Fakes' purchase agreement and deed.  The language specifically gave notice of the noise from airport operations, intending to prevent the Fakes from seeking compensation from IAA.  Biddle v. BAA Indianapolis, LLC, 830 N.E.2d 76, 87 (Ind. Ct. App. 2005), vacated.

[7] Prior to our granting transfer, the parties stipulated to the dismissal with prejudice of the Fakes and BAA.  Thus, we denied BAA's Petition for Transfer.  Only appellants Jays, Kheiris, and Shannons, and appellee IAA remain.

IAA argues that because flights within the navigable airspace do not cause a taking, Homeowners cannot succeed on their inverse condemnation claim.

*A. Standard of Review*

Summary judgment is appropriate when there is no genuine issue of material fact and the movant shows he is entitled to judgment as a matter of law. Ind. Trial Rule 56(C).

Whether a taking occurred can be subject to summary judgment. Taylor-Chalmers, Inc. v. Bd. of Comm'rs of LaPorte County, 474 N.E.2d 531, 536 (Ind. Ct. App. 1985) (Hoffman, J., concurring) ("Although takings cases may be extremely fact sensitive, the ultimate application of constitutional provisions to an established set of facts involves a pure question of law." (citing Indiana Supreme Court cases)). Accord Beck v. City of Evansville, 842 N.E.2d 856, 863-64 (Ind. Ct. App. 2006) (finding no taking of homeowners' property on review of trial court's grant of summary judgment to city).

And, as several other states have held, appellate review of whether a taking occurred is proper. Wild Rice River Estates, Inc. v. City of Fargo, 705 N.W.2d 850, 854 (N.D. 2005) (whether a taking occurred is question of law fully reviewable on appeal); Eberth v. Carlson, 266 Kan. 726, 731, 971 P.2d 1182, 1186 (1999) (whether there has been a compensable taking is a question of law permitting "unlimited" appellate review); Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 932-33 (Tex. 1998) (citing United States v. Causby, 328 U.S. 256, 259 (1946)) ("the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law," implying that de novo review is appropriate). But see Thornburg v. Port of Portland, 233 Or. 178, 192, 376 P.2d 100, 106-07 (1962) (trier of fact makes determination as to when aircraft noise becomes so burdensome as to constitute a taking).

Once a taking is found, the question of how much compensation to award is then appropriate for a trier of fact.

5

*B. First Principles: Origins of the Fifth Amendment*

In the American colonial period, law in the colonies was that the Crown could revoke at will its grant of property. During the Revolution, there was widespread belief in the power of the common good (called "republicanism") and in the trustworthiness of legislatures. The newly independent states adopted constitutions granting nearly plenary power to legislatures. None of the first state constitutions contained provisions for just compensation; indeed, only three included clauses regulating government taking of property.[8] When colonial draftsmen did perceive the need to restrain the seizure of real property, they thought it adequate simply to require that seizure occur only by act of the legislature.[9]

It was not until the summer of the Philadelphia constitutional convention that the idea of compensation for taking real property became a part of the national government's political agenda. The Confederation Congress, meeting in New York, placed such a provision in the Northwest Ordinance of 1787.[10] By this time, excesses even by the Continental military fomented a discontent that eventually led to the adoption of the Fifth Amendment takings clause.[11]

---

[8] See Note, The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment, 94 Yale L.J. 694, 698 n.15 (1985) (the states were Maryland, New York, and North Carolina).

[9] George Mason's draft of the Virginia Declaration of Rights, for example, provided that men could not be "deprived of their property for public uses, without their own consent, or that of their representatives." Original Draft of the Virginia Declaration of Rights, 1776, reprinted in B. Schwartz, The Bill of Rights: A Documentary History 73, 242 (1971).

[10] Article 2 of the Northwest Ordinance read in part:

> No man shall be deprived of his liberty or property, but by the judgment of his peers, or the law of the land, and should the public exigencies make it necessary, for the common preservation, to take any person's property, or to demand his particular services, full compensation shall be made for the same.

Northwest Ordinance of 1787, art. 2, reprinted in 1 P. Kurland & R. Lerner, The Founder's Constitution 28 (1987).

[11] The Revolutionary War was underway but two years when prominent citizens began to complain about seizure of property. John Jay submitted a complaint to the New York legislature about "the Practice of impressing Horses, Teems, and Carriages by the military, without the Intervention of a civil Magistrate, and without any Authority from the Law of the Land." John Jay, A Freeholder, A Hint to the Legislature of the State of New York, Winter 1778, reprinted in 5 P. Kurland & R. Lerner, supra note 10, at 312. The shift in sentiment among propertied classes who wrote the Constitution and the Bill of Rights is fully described in Note, supra note 8, at 704-05.

Thus, the Fifth Amendment to the Constitution states: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

The amendment's principal author, James Madison, believed government should take a reverent view toward the property of its citizens by refraining from harming their property in any way. For example, in his "Speech Opposing Paper Money" before the Virginia Assembly, Madison argued that because paper money depreciates, it "affects Rights of property as much as taking away equal value in land." Its use, he added, is like the "case of land p[ai]d for down [and] to be convey[e]d in [the] future, [and] of a law permitting conveyance to be satisfied by conveying a part only – or other land of inferior quality." 9 James Madison, The Papers of James Madison 158-59 (R. Rutland et al. eds., University of Chicago Press 1975) (quoting Madison's "Notes for Speech Opposing Paper Money").[12]

Like the other framers, Madison intended that the clause apply only to physical seizure of property by the federal government.[13] He also believed the courts could best carry out these broader protections. See 12 James Madison, The Papers of James Madison 206-07 (R. Rutland et al. eds., University Press of Virginia 1979) (speech proposing the Bill of Rights).[14]

---

[12] Dean William Treanor of Fordham University School of Law has suggested Madison also intended the clause to have broader significance in symbolizing the sanctity of private property. See William Michael Treanor, The Original Understanding of the Takings Clause and the Political Process, 95 Colum. L. Rev. 782, 837 (1995). In an essay for the National Gazette, Madison wrote that a government "which provides that [no property] shall be taken *directly* even for public use without indemnification to the owner" is one "which prides itself in maintaining the inviolability of property." James Madison, Property, Nat'l Gazette, Mar. 29, 1792, reprinted in 14 James Madison, The Papers of James Madison 266-68 (R. Rutland et al. eds., University Press of Virginia 1983). Such a government breaks that commitment if it "*indirectly* violates their property, in their actual possessions, in the labor that acquires their daily subsistence, and in the hallowed remnant of time which ought to relieve their fatigues and soothe their cares." Id.

[13] See Randall T. Shepard, Land Use Regulation in the Rehnquist Court: The Fifth Amendment and Judicial Intervention, 38 Cath. U. L. Rev. 847, 855 (1989); Note, supra note 8, at 710-13.

[14] Madison said:

> [I]ndependent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the legislative or executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the constitution by the declaration of rights.

12 James Madison, The Papers of James Madison 206-07 (R. Rutland et al. eds., University Press of Virginia 1979).

About halfway through our national history, the U.S. Supreme Court determined that due process under the Fourteenth Amendment requires the states, not just the federal government, to compensate an owner when his or her private property is taken for public use. Chicago, Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. 226, 241 (1897).[15]

A generation later, Justice Holmes' opinion in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922), first articulated the notion that government activities short of direct seizure could constitute takings. The U.S. Supreme Court eventually developed a framework for analyzing "regulatory takings" claims.[16] The modern test states that regulation effects a taking if it deprives an owner of all or substantially all economic or productive use of his or her property. See Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 538-40 (2005).[17] See also Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019 & n.8, 1030 (1992); Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 127 (1978). This test focuses on several factors: the economic impact of the regulation on the claimant, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action. Dep't of Natural Res. v. Ind. Coal Council, Inc., 542 N.E.2d 1000, 1003 (Ind. 1989); Penn Cent., 438 U.S. at 124.

---

[15] Courts frequently cite this case for "incorporating" the takings clause and making it applicable to the states. See Shepard, supra, at 857. As the Fourteenth Amendment was under consideration in Congress, a proposal to include a takings clause was rejected. Benjamin Kendrick, Journal of the Committee of Fifteen on Reconstruction 85 (1969), cited in Earl M. Maltz, One The Fourteenth Amendment as Political Compromise – Section in the Joint Committee on Reconstruction, 45 Ohio St. L.J. 933, 958-59 (1984).

[16] See generally Lingle v. Chevron U.S.A., Inc., 544 U.S. 528 (2005); Dolan v. City of Tigard, 512 U.S. 374 (1994); Lucas v. S.C. Coastal Council, 505 U.S. 1003 (1992); Nollan v. Cal. Coastal Comm'n, 483 U.S. 825 (1987); Agins v. City of Tiburon, 447 U.S. 255 (1980), abrogated by Lingle, 544 U.S. at 545; Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978). See also Fred F. French Investing Co., Inc. v. City of New York, 39 N.Y.2d 587, 350 N.E.2d 381 (1976) (early discussion of regulatory takings claims).

[17] In Lingle, the unanimous Court simplified regulatory takings analysis by significantly abrogating Agins, where the Court had held that a regulation effected a taking if it did not "substantially advance legitimate state interests." Agins, 447 U.S. at 260. Justice O'Connor, writing for the Court in Lingle, explained:

> Instead of addressing a challenged regulation's effect on private property, the 'substantially advances' inquiry probes the regulation's underlying validity. But such an inquiry is logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose.

544 U.S. at 543. This author had earlier argued for deleting the "substantially advances" part of the takings test. Randall T. Shepard, Takings Law: Do We Really Want More Judicial Intervention in State Land Use Regulation?, 1 Geo. J.L. & Pub. Pol'y 99 (2002-2003). As a result of Lingle, the Lucas and Penn Central tests remain the primary foci of regulatory takings analysis. Id. at 539-40, 548. To the extent our prior decisions have relied on the Agins formulation, they are overruled.

There is at least one state decision holding that airport noise in the nature of "nuisance" can constitute a taking. See Thornburg, 233 Or. at 190, 376 P.2d at 105 ("A nuisance can be such an invasion of the rights of a possessor as to amount to a taking, in theory at least, any time a possessor is in fact ousted from the enjoyment of his land."). However, the Court of Federal Claims has said that the "'great weight' of Federal authority" is that a taking occurs only when aircraft are present in the "superjacent airspace" (meaning the air the owner reasonably occupies for his own use). Branning v. United States, 654 F.2d 88, 99 (Ct. Cl. 1981).

## C. Can the Noise from Aircraft Flights Be a Taking?

The seminal case on aircraft noise is United States v. Causby, 328 U.S. 256 (1946). There, the Court found a taking when various military aircraft flew directly over private property while taking off and landing at a nearby airfield. Id. at 267. Planes flew close enough to the property "to appear barely to miss the tops of the trees and at times so close . . . as to blow the old leaves off." Id. at 259. The property had been used as a chicken farm, and as a result of the aircraft noise, about 150 chickens killed themselves "by flying into the walls from fright." Id. The situation forced the Causbys to abandon their use of the property as a chicken business. The noise also deprived the Causbys of sleep and the family became "nervous and frightened" as a result of several accidents that occurred near the airfield. Id.

The Supreme Court noted the military aircraft flew over the Causby property at least 83 feet above ground level but below the statutory boundaries for navigable airspace.[18] Id. at 263-64. The Court said:

> The airplane is part of the modern environment of life, and the inconveniences which it causes are normally not compensable under the Fifth Amendment. The airspace, apart from the immediate reaches above the land, is part of the public domain. . . . Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land.

---

[18] The Civil Aeronautics Authority had earlier prescribed 500 feet above ground level as the minimum boundary for navigable airspace during the day and 1000 feet during the night for air carriers over the Causby property. The boundary for navigable airspace ranged from 300 to 1000 feet for other aircraft, depending on the type of plane and terrain. Causby, 328 U.S. at 263-64.

Id. at 266. The Court held the government had taken a flight easement over the Causby property and remanded for the Court of Claims (now called the Court of Federal Claims) to determine whether the easement was permanent or temporary. Id. at 267-68.

The Supreme Court applied the Causby rule in Griggs v. County of Allegheny, 369 U.S. 84 (1962). After the decision in Causby, the Civil Aeronautics Authority, a predecessor to the modern Federal Aviation Administration, changed the boundaries for navigable airspace by including airspace necessary for take-off and landing. Griggs, 369 U.S. at 88-89.[19] Mr. Griggs owned property near the Greater Pittsburgh Airport. Planes taking off and landing at the airport passed over Griggs's property from 30 to 300 feet above the roof of his residence. Id. at 85, 87. The planes flew continuously, often making it impossible for members of his household to sleep at night, even with earplugs and sleeping pills, or to use the telephone. Noise from the planes frequently rattled the windows and shook plaster off walls and ceilings. Id. at 87. Even though planes flew within navigable airspace, the Court found the flights had taken an air easement. The Court also held the owner of the airport, Allegheny County, took the air easement, not the United States or the airlines. Id. at 89-90.

In a series of subsequent decisions, the Court of Federal Claims has refined the doctrine established under Causby and Griggs. First, in Aaron v. United States, 311 F.2d 798 (Ct. Cl. 1963), the court articulated a presumption based on navigable airspace boundaries. When an aircraft flies within the navigable airspace directly above private property, the court presumes there is no taking unless the effect on private property is "so severe as to amount to a practical destruction or a substantial impairment of it." Id. at 801. The court observed:

> It is true that the inconvenience and annoyance experienced from the passage of a plane at 501 feet above a person's property is hardly distinguishable from that experienced from the passage of a plane at, say, 490 feet, but the extent of a right-of-way, whether on the ground or on water or in the air, has to be definitely fixed. Acts that are permissible within the limits of the right-of-way are forbidden beyond its limits, and vice versa. Congress has fixed 500 feet as the lower limit of navigable air space; hence, what may be permissible above 500 feet is forbidden below it, unless compensation is paid therefor.

---

[19] This change seems to have been motivated by the language in Causby that declared navigable airspace part of the public domain. Because the flights in Causby occurred below what the Court determined was navigable airspace, it was arguable that flights within the navigable airspace could not cause a taking.

Id. Based on this rule, the court found some of the plaintiffs had suffered a taking and others had not, because some of the planes flew in the navigable airspace but others did not. Id. at 801-02.

Then, in Branning, the court demonstrated what facts satisfy the "practical destruction" or "substantial impairment" exception to the presumption. 654 F.2d at 98, 102. Heavy military jet aircraft followed one another almost nose to tail in a loop 600 to 1000 feet above ground directly over plaintiff's property. Id. at 91-92. The military could have performed these exercises elsewhere, but chose the airspace above plaintiff's property because it deemed other locations more problematic. Id. at 90. The plaintiff complained that noise from the exercises destroyed the property's value for residential use. Id. at 92. The court held this constituted a taking within the "practical destruction" exception to the Aaron no-taking presumption for flights in the navigable airspace. Id. at 102.

IAA urges us to follow the approach used by the Court of Federal Claims by adopting the Aaron presumption. While the regulatory takings analysis of Lingle is an adequate tool for evaluating takings claims generally, the Aaron presumption is specially tailored to the task of identifying government takings based on aircraft noise. Our survey of airport noise cases over the last half century suggests that the Court of Federal Claims and the U.S. Court of Appeals for the Federal Circuit may issue more opinions on this topic, under the pens of multiple judges, than the remainder of the American bench combined. The presumption adopted in Aaron seems to have served them well in deciding these cases. See, e.g., Testwuide v. United States, 56 Fed. Cl. 755 (2003) (applying Causby, Aaron line of cases). Because of their favorable experience and because takings jurisprudence is widely acknowledged as needy of guideposts, we elect to follow the same approach.

Some of our own inverse condemnation cases have labeled the required degree of harm for takings a "special" or "peculiar" injury. See, e.g., Young v. State, 252 Ind. 131, 246 N.E.2d 377 (1969). "In order to receive compensation in a condemnation action the landowner must show that the injury is special and peculiar to his real estate and not some inconvenience suffered by the public generally." Id. at 134, 246 N.E.2d at 379. This requirement has two aspects to it. First, the injury must be different in kind from what the public experiences. Second, the injury

11

must be of a degree that exceeds mere inconvenience. See State v. Tolliver, 246 Ind. 319, 331, 205 N.E.2d 672, 677-78 (1965); State v. Ensley, 240 Ind. 472, 484, 164 N.E.2d 342, 347 (1960).

Neither of these seems to add much to the task of identifying takings. It merely states the obvious to observe that to have a plausible takings claim one must experience a burden not shared by the public generally. And one who suffers "mere inconvenience" likely possesses an extraordinarily weak takings claim.

We think the Lingle analysis, as examined with the Aaron presumption, is a more precise standard for measuring the degree of harm, one that will result in more consistent decisions.

In this case, Homeowners did not demonstrate injury sufficient to support an exception to the Aaron presumption. For one thing, the flight altitudes alleged are several times higher than the minimum navigable airspace. While the noise from aircraft flying between 1,300 and 4,800 feet above ground is no doubt considerable, the trial court was warranted in concluding that it does not amount to a "practical destruction" or "substantial impairment" of Homeowners' use of their properties. Homeowners still make many valuable uses of their properties in spite of the noise. The aircraft noise has not effected a taking, and the trial court correctly granted summary judgment.

## II. Promissory Estoppel Against the Government

Homeowners contend that IAA is estopped from declining to offer the terms of the Backs lawsuit settlement to all litigants from Hawthorne Ridge. The estoppel claim is based on the statements allegedly made by Airport officials at public meetings in 1997 and 1998.[20] Homeowners argue they are third-party beneficiaries of the alleged promises, even though they were not present, and should thus prevail under principles of promissory estoppel.

---

[20] Apparently, Homeowners see these statements as a promise to treat Hawthorne Ridge residents uniformly and equally – for the indefinite future. Thus, IAA's subsequent unwillingness to offer the Backs settlement terms to all Hawthorne Ridge owners constituted a "breach" of promise. Moreover, Homeowners allege they refrained from joining the Backs suit in reliance on IAA's promise.

IAA argues the Homeowners' absence from the meetings prevented them from receiving any promise, and therefore, without an underlying promise, the promissory estoppel claim must fail.

Estoppel is not generally applicable against government entities for the actions of public officials. Story Bed & Breakfast, LLP v. Brown County Area Plan Comm'n, 819 N.E.2d 55, 67 (Ind. 2004); Muncie Indus. Revolving Loan Fund Bd. v. Ind. Constr. Corp., 583 N.E.2d 769, 771 (Ind. Ct. App. 1991). As Judge Garrard aptly explained: "If the government could be estopped, then dishonest, incompetent or negligent public officials could damage the interests of the public. At the same time, if the government were bound by its employees' unauthorized representations, then government, itself, could be precluded from functioning." Samplawski v. City of Portage, 512 N.E.2d 456, 459 (Ind. Ct. App. 1987).

On the other hand, the general rule is subject to exception. "[E]stoppel may be appropriate where the party asserting estoppel has detrimentally relied on [a] governmental entity's affirmative assertion or on its silence where there was a duty to speak." Equicor Dev., Inc. v. Westfield-Washington Twp. Plan Comm'n, 758 N.E.2d 34, 39 (Ind. 2001). But the government will not be estopped in the absence of clear evidence its agents made such representations. Story Bed & Breakfast, 819 N.E.2d at 67. Moreover, a party asserting promissory estoppel must establish five elements: "(1) a promise by the promissor (2) made with the expectation that the promisee will rely thereon (3) which induces reasonable reliance by the promisee (4) of a definite and substantial nature and (5) injustice can be avoided only by enforcement of the promise." First Nat'l Bank of Logansport v. Logan Mfg. Co., Inc., 577 N.E.2d 949, 954 (Ind. 1991).

Homeowners have not demonstrated adequate grounds for any exception to the general rule precluding estoppel. First, Homeowners fail to demonstrate clear evidence that a promise was made. The public statements made by IAA officials are more akin to a statement of policy than a promise. Even assuming *arguendo* that the statements were promises, it is clear they referred to the operation of IAA's land use programs, not to settlement of future litigation.

13

Second, Homeowners fail to establish detrimental reliance. While they claim they relied on IAA's alleged promises in refraining from joining the Backs lawsuit, such reliance is not detrimental. Homeowners have always retained the right to file their own action on similar grounds. Furthermore, Homeowners suffer no prejudice from their alleged reliance. IAA continues to offer the land use programs to property owners to assuage the effects of the Airport's operations on its neighbors. IAA has treated Homeowners differently only in its unwillingness to offer them the Backs lawsuit settlement terms. Thus, the only detriment Homeowners have supposedly suffered is that they could not get for free what the Backs plaintiffs got by initiating litigation.

The general rule precluding estoppel against the government applies to Homeowners' promissory estoppel claim. The trial court properly gave judgment to IAA.

### III.  The Fakes' Inverse Condemnation Claim

The trial court granted summary judgment against appellants Todd and Rosalyn Fakes on grounds that their seller accepted payment for damage to value done by airport noise, and provided the requisite formal notice of this fact to the Fakes as buyers. Counsel argues this was error, deploying law about the release of claims during real estate sales.

It seems more pertinent to observe that a principal consideration in determining whether a taking has occurred is whether the impact of government action "has interfered with distinct investment-backed expectations." Penn Cent., 438 U.S. at 124. The Fakes are owners who purchased at a reduced price, with the knowledge that the bargain rate existed because of airport noise.

We summarily affirm the Court of Appeals' disposition of the Fakes' inverse condemnation claim. Ind. Appellate Rule 58(A).

14

## Conclusion

We affirm the judgment of the trial court.

Dickson, Sullivan, Boehm, Rucker, JJ., concur.