

FILED

Jul 07 2017, 5:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Philip D. Sever
Sever-Storey, L.L.P.
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Andrea E. Rahman
David L. Steiner
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| AAA Federal Credit Union,<br>*Appellant-Petitioner,*<br><br>v.<br><br>Indiana Department of<br>Transportation,<br>*Appellee-Respondent.* | July 7, 2017<br><br>Court of Appeals Case No.<br>71A03-1609-PL-2091<br><br>Appeal from the St. Joseph<br>Superior Court<br><br>The Honorable Margot F. Reagan,<br>Judge<br><br>Trial Court Cause No.<br>71D04-1409-PL-270 |

**Mathias, Judge.**

[1]     In this inverse condemnation case, we consider whether the trial court erred in concluding that the landowner did not have a property interest in the free flow of traffic from a particular road. Concluding that it did not err in reaching that conclusion, we affirm.

# Facts and Procedural Posture

[2] U.S. Highway 31 ("U.S. 31") runs the length of Indiana, passing by or through the cities of Indianapolis in Marion County, Plymouth in Marshall County, and South Bend in St. Joseph County. As part of a larger effort to improve transportation between Marion County and St. Joseph County, in March 2002, the Federal Highway Administration ("FHWA") and the Indiana Department of Transportation ("DOT") began the process of public involvement in connection with a proposed improvement to U.S. 31 between Plymouth and South Bend ("the Project").

[3] On March 1, 2004, two years after DOT's public involvement with the Project began, AAA Federal Credit Union ("AAA"), a small regional bank with branches in and around St. Joseph County, took title by deed to a three-quarter acre plot of land in a mixed residential and commercial area on the south side of South Bend ("the Property").[1] In early 2006, AAA finished construction of a branch building on the Property and has operated the branch on the Property since. The Project was completed sometime later.

[4] Before the Project was completed, the Property lay at the northeast corner of the intersection of U.S. 31, running north-south, and Dice Street, running east-west. The Property had direct access by a western driveway to U.S. 31 and by a

---

[1] On appeal, both AAA and DOT state that AAA purchased the Property in 2002. Appellant's Br. at 5; Appellee's Br. at 7. The trial court, however, found, "On March 1, 2004, [AAA] purchased [the Property]." Appellant's App. p. 15. A copy of the deed is in the record before us, dated March 1, 2004. Appellee's App. p. 11. Neither party alleges error in the trial court's factual findings; we therefore accept them as given.

southern driveway to Dice Street. At that time, U.S. 31 was an undivided, open-access road on the same grade as the surrounding roads. However, one of the Project's goals was to improve traffic flow on U.S. 31 by converting it to a divided, grade-separated, limited- or controlled-access road.

[5] The Project moved U.S. 31 to the west by a few dozen feet. It is now a divided highway divided by a grass median, bounded by a wall to the east of the northbound lanes. Access to and from U.S. 31 is now possible only by grade-separated interchanges to the north and south of the Property. The Project left the Property entirely untouched. It continues to enjoy access to Dice Street by the southern driveway. However, the western driveway now accesses Hildebrand Street, a two-lane north-south frontage road running parallel to U.S. 31, separated from it by the eastern wall. To access the Property from U.S. 31 or vice versa now requires taking more or less circuitous routes to the north or south.

[6] On September 17, 2014, AAA brought the instant action for inverse condemnation against DOT. After a two-day bench trial on May 24 and 25, 2016, the trial court entered findings of fact, conclusions of law, and judgment for DOT. AAA now appeals, claiming the trial court erred in concluding that no compensable taking had occurred as a matter of law.

## Standard of Review

[7] Where, as here, a trial court has entered findings and conclusions prior to judgment, we review the judgment in two steps. *Canteen Serv. Co. of Indianapolis,*

*Inc. v. Ind. Dep't of Transp.*, 932 N.E.2d 749, 571 (Ind. Ct. App. 2010). We first determine whether the evidence supported the findings, then whether the findings supported the conclusions. *Id.* We will set aside the judgment only if clearly erroneous, leaving us with a firm conviction that a mistake has been made. *Id.* A judgment that applies the wrong legal standard to properly found facts is clearly erroneous. *Id.* Whether there has been a compensable taking is a question of law we review de novo. *Biddle v. BAA Indianapolis, L.L.C.*, 860 N.E.2d 570, 575 (Ind. 2007).

## Discussion and Decision

[8] By federal and state constitutional mandate, the state may not exercise its power of eminent domain to take private property for public use without paying just compensation. U.S. Const. amend. V, cl. 5; Ind. Const. art. I, § 21, cl. 2 ("the takings clauses"); *Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 241 (1897) (incorporating federal takings clause against states); *State v. Kimco of Evansville, Inc.*, 902 N.E.2d 206, 212 (Ind. 2009) (same analysis under federal and state takings clauses). The prospective exercise of the state's eminent domain power is regulated by statute. Ind. Code art. 32-24.

[9] However, "[a] person having an interest in property that has [already] been . . . acquired for public use without the procedures of this article or any prior law followed is entitled to . . . damages . . . ." *Id.* § 32-24-1-16. Damages actions under this section are called "inverse condemnation" actions. *State v. Dunn*, 888 N.E.2d 858, 861 (Ind. Ct. App. 2008), *trans. denied*. Proceedings on inverse

condemnation actions are bifurcated into a summary phase and a damages phase. *Id.* The summary phase is litigated before the court, which must decide whether there has been a compensable taking as a matter of law. *Id.* If so, the damages phase is tried to the fact-finder, which determines how much compensation the landowner is owed by the condemnor. *Id.*

[10] The United States Supreme Court has recognized two broad categories of takings: "The paradigmatic taking . . . is a direct government appropriation or physical invasion of private property" effecting "practical ouster . . . ." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (citations and quotations omitted). However, the Court has also "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster . . . ." *Id.* In identifying such "regulatory takings," *id.*, the Court has urged "cognizan[ce] . . . that Government hardly could go on if to some extent values incident to property could not be diminished without paying for every . . . change in the general law[.]" *Id.* at 538 (citation and quotations omitted).

[11] The Court has recognized three broad categories of regulatory takings. Requiring a landowner to suffer "permanent physical invasion of her property — however minor — " is a per se regulatory taking. *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (state law required landlords to permit cable companies to install cable facilities in apartment buildings)). So too is a regulation "that completely deprive[s] an owner of all economically beneficial use of her property." *Id.* (original alteration, emphasis,

citation, and quotations omitted). Outside these two per se categories, regulatory takings are tested by applying the factors set out in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978). These include the economic impact of the regulation on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the state action. *Biddle*, 860 N.E.2d at 577-78 (citing *Lingle*, 544 U.S. at 538-39; *Penn Cent.*, 438 U.S. at 124). The "common touchstone" of all three regulatory takings analyses is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539.

[12]     Irrespective of the species of taking alleged, "[t]he threshold question in determining whether a taking has occurred is whether the . . . landowner has a property interest in the property that has been acquired by the State." *Dunn*, 888 N.E.2d at 862. In the specific context of landowners abutting reconfigured highways, two complementary rules are thoroughly well-settled. First, the right of an abutting landowner to ingress and egress over the public roads is a cognizable property right, and substantial or material interference with this right by the state is a compensable taking ("the ingress-egress rule"). *Kimco*, 902 N.E.2d at 214; *State v. Ensley*, 240 Ind. 472, 164 N.E.2d 342, 349 (1960); *Green River Motel Mgmt. of Dale, L.L.C. v. State*, 957 N.E.2d 640, 644 (Ind. Ct. App. 2011), *trans. denied*; *Canteen Serv. Co.*, 932 N.E.2d at 753; *Dunn*, 888 N.E.2d at 862. Second, by contrast, an abutting landowner has no cognizable property

right in the free flow of traffic past his property ("the traffic-flow rule"). *Kimco*, 902 N.E.2d at 214; *Ensley*, 164 N.E.2d at 350; *Green River*, 957 N.E.2d at 644; *Canteen Serv.*, 932 N.E.2d at 753; *Dunn*, 888 N.E.2d at 862.

[13] The traffic-flow rule denies recovery to landowners who complain that, as a result of highway improvement or reconfiguration, the landowner's invitees must take a more circuitous or inconvenient route to the land, while the points of ingress and egress over the land remain unaffected. *Ensley* denied recovery to a recreational center whose property value was reduced when the state divided the north-south road abutting the center to the east by installing a raised median, blocking northbound traffic from turning left directly into the center and forcing it to take a more circuitous route to a different entrance. 164 N.E.2d at 350. *Kimco* "reaffirm[ed] *Ensley*," 902 N.E.2d at 208, and denied recovery to a shopping complex whose property value was reduced by forty percent when the state widened an abutting road and installed a median. *Id.* at 209, 215. This court has followed our supreme court's long-standing approach. *Green River*, 957 N.E.2d at 642, 645 (no recovery where U.S. highway moved quarter-mile to west; access to property from new U.S. highway and interstate required 1.6- to 4.6-mile detour); *Canteen Serv.*, 932 N.E.2d at 750–51, 755 (no recovery where previously abutting street moved 210 feet south and reconfigured access to property required travel on frontage road); *Dunn* 888 N.E.2d at 859, 867 (no recovery where installation of median redirected traffic).

[14] This case is controlled by the traffic-flow rule. AAA complains that customers driving on U.S. 31 now must take a more circuitous and inconvenient route to

reach the Property, while their western and southern driveways — along with the rest of the Property — have remained completely untouched. Indeed, this case is even farther from a compensable taking than is the ordinary traffic-flow case. Here, AAA does not complain of impairment to the free flow of traffic past its property in general. There was no showing, and AAA does not argue, that access from Hildebrand Street, the new frontage road, is any more difficult than was access from U.S. 31 before the Project was completed, and Dice Street remained unaffected by the Project. Rather, AAA argues that the flow of traffic *from U.S. 31* has been impaired by the Project. *See* Appellant's Br. at 23 ("[D]irect access to U.S. 31 is a property right."). If AAA has no cognizable property interest in the free flow of traffic past its property, still less does it have such a right in the free flow of traffic from a particular road. Put differently, AAA is claiming a property interest in continuing to abut a particular *type* of road: "[A]n actively used U.S. highway must continue to remain an actively used U.S. highway, and any change in the *nature* of the roadway [abutting a property] . . . results in a taking." Appellee's Br. at 23. As DOT correctly observes, this is not and cannot be the rule.

[15] AAA makes three arguments in favor of its position. First, AAA argues that the Project deprived the Property of its highest and best use as a site for a bank branch. However, this argument conflates the measure of damages for a compensable taking with the inquiry into whether such a taking happened at all:

> "[I]f the highest and best use before the taking is for one purpose, and because of the access available after the taking, the property was no longer suitable for that use, but was still suitable for a less valuable use, the owner would be entitled to the damages reflecting the diminished value." . . . This language addressed damages from a taking . . . Elimination of all access to [the new U.S. highway] may have met the test. But [the landowner] did not suffer a compensable taking of access in the first instance.

*Kimco*, 902 N.E.2d at 215 (internal citation omitted) (quoting *State v. Peterson*, 269 Ind. 340, 381 N.E.2d 83, 85 (1978)).

[16] Second, AAA points us to three cases readily distinguishable from that at bar, and repeatedly so distinguished in the case law. In *State v. Geiger & Peters, Inc.*, 245 Ind. 143, 196 N.E.2d 740 (1964), our supreme court found a compensable taking by a substantial or material interference with the landowner's right of ingress and egress. 196 N.E.2d at 743. There, construction of an expressway destroyed one of the landowner's two points of access to the property. *Id.* at 741. The second access-point was rendered unusable by the installation of a narrow service road which was incapable of bearing the ninety-foot steel trusses manufactured on the property. *Id.* at 742. Here, by contrast, both access-points were completely untouched by the state. *See Kimco*, 902 N.E.2d at 213 n.8 (distinguishing *Geiger & Peters* as ingress-egress case from traffic-flow cases); *Dunn*, 888 N.E.2d at 864 (same).

[17] *State v. Tolliver*, 246 Ind. 319, 205 N.E.2d 672 (1965), was factually analogous to *Geiger & Peters*, and our supreme court again found the case to be controlled by the ingress-egress rule. 205 N.E.2d at 677-78. There, one of the landowner's

two access-points was destroyed by the construction of an interstate. *Id.* at 673. Though the second access-point was left untouched, it was reachable only after crossing a bridge that was incapable of bearing the fifty-ton loads regularly transported from the landowner's steel-fabrication plant. *Id.* Thus, the landowner had no "reasonable outlet or access left . . . [,]" *id.* at 678, in effect, no access at all. The facts here are distinguishable on the same basis as they were from *Geiger & Peters*: neither access-point has been made actually or constructively unusable; the only difference in their use is some additional inconvenience to drivers on U.S. 31. *See Kimco*, 902 N.E.2d at 213 n.8 (distinguishing *Tolliver* as ingress-egress case from traffic-flow cases); *Dunn*, 888 N.E.2d at 864–65 (same).

[18] In *State v. Diamond Lanes*, 251 Ind. 520, 242 N.E.2d 632 (1968),

> a landowner operated a bowling alley on a piece of property accessible by four access points and by traffic traveling in either direction on two roads. . . . [T]he State constructed [a new highway] that cut of access with certain directions of traffic to the business property . . . . At first blush, *Diamond Lanes* appears to be a traffic flow case. However, [our supreme court] explained that *the primary access point was "completely eliminated"* and the access to another road "was taken and in its place there was substituted access onto a frontage road" . . . .

*Dunn*, 888 N.E.2d 865–66 (emphasis added). Unlike *Geiger & Peters* and *Tolliver*, therefore, *Diamond Lanes* only involved destruction of one access-point, plus complications and ensnarlments for traffic at other access-points. *Diamond Lanes* is still distinguishable from this case on the grounds that, here, no access-point

was completely or partially eliminated, or even altered. *See Kimco*, 902 N.E.2d at 213 n.8 (*Diamond Lanes* as ingress-egress case because "at least one access point 'completely eliminated,' and the substituted access could 'in no way be equated with the former access'"); *Canteen Serv.*, 932 N.E.2d at 754 ("*Diamond Lanes* does not stand for a bright-line rule that the creation of a frontage road is necessarily a taking. . . . To the contrary, . . . *Diamond Lanes* [is about] a change in the means of access to an owner's property . . . .").

[19] Finally, AAA argues it is entitled to free-floating consideration of its allegedly reduced property value[2] under *Biddle*, *Lingle*, and *Penn Central*. However, it is not, for three reasons. First, the *Lingle* framework applies to *regulatory* takings, cases where "government regulation of private property [is] so onerous that its effect is tantamount to a direct appropriation or ouster[.]" *Lingle*, 544 U.S. at 537. Here, and in the other traffic-flow cases discussed here, there was no regulation of private property. The state reconfigured public property; it did not regulate private property.

[20] More fundamentally, *Biddle*, *Lingle*, and *Penn Central* never purported to dispense with the antecedent inquiry of whether a cognizable private property interest has been burdened, encumbered, or interfered with in the first place. *See Penn Cent.*, 438 U.S. at 125 (citing cases where government action "did not interfere with interests that were sufficiently bound up with the reasonable

---

[2] AAA's expert reported that the value of the Property was reduced from $800,000 before the Project to $100,000 after the Project. Appellant's App. p 23.

expectations of the claimant to constitute 'property'"); *Bettendorf v. St. Croix County*, 631 F.3d 421, 424 (7th Cir. 2011) ("The Takings Clause *presupposes* government interference with one's property rights . . . ." (emphasis added)), 425 n.2 ("[P]roperty interests are created and defined by an independent source, such as . . . state law."). Identifying cognizable property interests is precisely the function of the post-*Ensley* distinction between traffic-flow cases and ingress-egress cases. "Although not phrased in the *Lingle* language, the substance of [*Ensley*'s] view anticipated a similar standard: any impaired value derived from some action that does not 'encroach upon the property' is not compensable." *Kimco*, 902 N.E.2d at 212-13 (quoting *Ensley*, 164 N.E.2d at 346). However, the state action in this case is to be characterized, it did not "encroach upon the property" of AAA. *Id.*

[21] Second, the specific controls over the general. In *Biddle* itself, while our supreme court set out the *Lingle* framework in dicta, it actually applied a different, pre-*Lingle*, pre-*Penn Central* analysis specific to the problem then before it: When do airplane fly-overs constitute a compensable taking of residential property? *Biddle*, 860 N.E.2d at 579 ("*Aaron* [*v. United States*, 311 F.2d 798 (Ct. Cl. 1968)] is specially tailored to the task of identifying government takings based on aircraft noise."). Similarly, in *Kimco*, our supreme court acknowledged *Biddle* and the *Lingle* framework, but decided the case before it by applying the principles of *Ensley* and its progeny, which we apply here.

[22] Third, even applying the *Lingle* framework and the *Penn Central* factors would not permit us to find a taking based on AAA's reduced property value because

AAA did not have a reasonable expectation that the configuration of U.S. 31 would remain unaltered. AAA bought the Property on March 1, 2004, two years after FHWA and DOT began involving the public in planning the Project. On March 26, 2002, FHWA published a Notice of Intent to Prepare an Environmental Impact Statement ("EIS") for the Project in the *Federal Register*. Public meetings of various kinds were held through 2002 and 2003, and news releases were distributed. A draft EIS detailing proposed routes for the improved U.S. 31 was made available for public review on February 27, 2004, and was open for public comment from March 5, 2004, to April 26, 2004. Though the draft EIS included, among other proposed alternatives, the present configuration of U.S. 31, DOT had no record of AAA participating in public comment. Ex. Vol., Resp't's Ex. O. On September 23, 2004, DOT publicly announced that the present configuration was the "preferred alternative" for the Project and would be advanced for consideration in a final EIS. *Id.* This was "well before" AAA obtained a building permit for the branch in September 2005. *Id.* To find a compensable taking on these facts would turn the state and taxpayers of Indiana into underwriters of the known risks of AAA's real estate investment.

## Conclusion

[23] The trial court ruled, "The cases are rather clear. There has been no taking under Indiana and federal law. It is understandable that the property owner [is upset because it] has lost the very easy direct access from the very busy old US 31, but under Indiana eminent domain law, this situation does not involve a

legal 'taking.'" Appellant's App. p. 17. We agree. The judgment of the trial court is therefore affirmed.

[24]    Affirmed.

Kirsch, J., and Altice, J., concur.