# FOR PUBLICATION



**FILED**

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LESLIE C. SHIVELY**
Shively & Associates, P.C.
Evansville, Indiana

ATTORNEY FOR APPELLEES:

**MICHAEL J. WRIGHT**
Wright, Shagley & Lowery, P.C.
Terre Haute, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MIDWEST MINERALS, INC., | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 84A04-1205-MI-258 |
| | ) | |
| FRED L. WILSON, RICK JENKINS, JOSEPH | ) | |
| KENWORTHY, MICHAEL TEWELL, AND JAMES | ) | |
| CLAYTON, IN THEIR OFFICIAL CAPACITY AS | ) | |
| MEMBERS OF THE BOARD OF ZONING APPEALS | ) | |
| OF THE AREA PLAN DEPARTMENT/COMMISSION | ) | |
| OF VIGO COUNTY AND ITS FORMER EXECUTIVE | ) | |
| DIRECTOR, TIM PORTER, AND PRESENT EXECUTIVE | ) | |
| DIRECTOR, JEREMY WEIR, AND THE BOARD OF | ) | |
| COMMISSIONERS OF VIGO COUNTY, | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

**APPEAL FROM THE VIGO SUPERIOR COURT**
The Honorable Robert E. Springer, Special Judge
Cause No. 84D01-0907-MI-7142

**February 27, 2013**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Midwest Minerals, Inc. ("MWM") appeals the trial court's judgment in favor of The Board of Zoning Appeals of the Area Plan Commission of Vigo County ("BZA") and the Board of Commissioners of Vigo County ("the Board of Commissioners") (collectively "the Boards") on MWM's complaint alleging inverse condemnation and seeking damages. MWM presents two issues for our review:

1.    Whether the trial court erred when it applied the doctrine of collateral estoppel to support a conclusion of law.

2.    Whether a regulatory taking occurred with respect to real property owned by MWM.

We affirm.

## FACTS AND PROCEDURAL HISTORY

This court has previously stated the relevant facts in this matter as follows:

Midwest owns [approximately 11.5 acres] of real estate in West Terre Haute, Indiana. This property is zoned M-2 heavy industrial and was formerly used for coal mining operations. Pursuant to Vigo County's Unified Zoning Ordinance, ("Zoning Ordinance"), the purpose of the M-2 heavy industrial district is to provide for establishments that primarily engage in manufacturing, construction, wholesaling, warehousing and associated retail, financial and services activities with a need for outdoor storage, processing, or operation. Vigo County Zoning Ordinance, Ind., § 6-105-10.02(A) (1996). The Zoning Ordinance provides an exhaustive list of permitted uses in the M-2 heavy industrial district, which includes but is not limited to: (1) forest products processing; (2) bottled gas storage and distribution; (3) manufacturing of cement, lime or gypsum; (4) manufacturing of construction equipment and machinery; (5) power plants; and (6) rolling and extruding of metal. See Zoning Ordinance § 6-105-10.02(B)(1).

The Zoning Ordinance also provides a list of activities that require obtaining a special exception from the BZA. A special exception is a use permitted under a zoning ordinance upon the showing of certain statutory criteria. Under Vigo County's Zoning Ordinance, such uses include, but

2

are not limited to, battery salvage and recycling, iron and steel production, concrete mixing, and manufacturing gas or chemicals. See Zoning Ordinance § 6-105-10.02(B)(4).

In 2002, Midwest approached the Vigo County Area Planning Department ("Planning Department") about establishing a molecular methane gas processing unit on its property in West Terre Haute. The processing unit would allow Midwest to extract coal mine methane gas and then process it by filtering out impurities to bring the methane gas to commercial grade. The executive director of the Planning Department determined that this activity constituted "manufacturing" gas, and therefore under provisions of the Zoning Ordinance, Midwest was first required to petition for and obtain a special exception from the BZA. See Zoning Ordinance § 6-105-10.02(B)(4).

Midwest did not appeal the Planning Department's decision at that time. Instead, Midwest applied to the BZA for a special exception, which was denied. In December of 2002, Midwest filed an amended verified petition for writ of certiorari, judicial review and declaratory judgment with the Vigo Superior Court, alleging that the BZA erroneously denied Midwest's application for a special exception and further alleging that Midwest was not required to obtain a special exception. The trial court affirmed the BZA's decision, and Midwest appealed.

On April 26, 2004, our court issued a unanimous memorandum decision, concluding, in part, that Midwest had failed to appeal the Planning Department's decision that it was required to obtain a special exception to establish its processing unit. Midwest Minerals v. BZA, No. 84A01-0403-CV-145 [808 N.E.2d 772] (April 26, 2004). Therefore, we determined that Midwest had not exhausted its administrative remedies, which deprived the trial court of subject matter jurisdiction over this claim. Regarding the claim that the BZA erroneously denied Midwest's application for a special exception, we reversed and remanded to the trial court with instructions to order the BZA to enter sufficient findings.

Midwest Minerals, Inc. v. Board of Zoning Appeals, 880 N.E.2d 1264, 1265-66 (Ind. Ct. App. 2008) (quoting Midwest Minerals, Inc. v. Board of Zoning Appeals, No. 84A05-0606-CV-316, 862 N.E.2d 726 (Ind. Ct. App. March 8, 2007) (affirming the trial court's order endorsing the BZA's determination that Midwest's proposed gas processing unit

3

would engage in "manufacturing" gas, and, as such, Midwest was thereby required to apply for a special exception) (footnote omitted), trans. denied), trans. denied.

On September 14, 2005, MWM filed a new application for a special exception, and, on February 8, 2006, following public hearings, the BZA granted the special exception subject to certain conditions. One of the conditions ("the public water condition") provided as follows:

> That the BZA finds that the issuance of said special exception shall be conditioned upon MWM providing public water to any residential use, existing and future, within ½ mile of any and all wells associated with coal mine methane processing to insure that there will be no contamination of the water supply to the surrounding residences. The BZA finds that without the provision of public water, as described above, the proposed use would be injurious to the public health, safety, comfort, morals, convenience and general welfare of the community. Further, the BZA finds that the threat of water well contamination would injure or adversely affect the use or value of other property in the immediate area in a substantially adverse manner.

Plaintiff's Exh. 8. MWM sought judicial review of the public water condition, and, on July 2, 2007, the trial court reversed the BZA's decision, removing the public water condition. The BZA did not appeal that decision. Accordingly, MWM has been free to begin construction of the molecular gate processing unit as described in the special exception application. But no construction on the processing unit has begun to date.

On July 31, 2009, MWM filed a complaint against the Boards alleging that the public water condition constituted a taking without compensation under Article I, § 21 of the Indiana Constitution and seeking damages. In particular, MWM asserted that the BZA's actions in imposing the public water condition constituted a "complete deprivation of [MWM's] property interest" from the time that the public water condition

4

was issued, February 8, 2006, until the trial court ruled that the public water condition

was invalid, on July 2, 2007. Following an evidentiary hearing, the trial court entered

judgment for the Boards and issued the following findings of fact and conclusions of law:

**84D04-0212-MI-9457 (Court Took Judicial Notice)**

1. On or about October 16, 2002, the Petitioner Midwest Minerals, Inc. (hereinafter referred to as "MWM"), filed its original Application with the Vigo County Board of Zoning Appeals (hereinafter referred to as "BZA") for a Special Exception to the Unified Zoning Ordinance of Vigo County (hereinafter referred to as "Zoning Ordinance") to build a molecular gate natural gas processing unit (hereinafter referred to as "Unit") to be located at 6450 West Evinger Avenue, West Terre Haute, Indiana 47885 (hereinafter referred to as the "Property"), which had a zoning classification of M-2 Heavy Industrial. The BZA denied that application.

2. MWM filed a Verified Petition for Writ of Certiorari, Judicial Review and Declaratory Judgment under Cause Number 84D04-0212-MI-9457. The Trial Court affirmed the decision of the BZA, denying the petition for a Special Exception.

3. On November 25, 2003[,] MWM initiated an appeal of the decision of the Trial Court. The issues on appeal were: (1) Whether the Trial Court committed reversible error when it determined that MWM was required to obtain a special exception for the proposed use, a molecular gate processing unit? (2) Whether the Trial Court committed reversible error in affirming the decision of the BZA, of the Area Plan Department/Commission of Vigo County, denying MWM application for a special use exception for the proposed use, a molecular gate processing unit?

* * *

9. On June 29, 2007, the Trial Court, by a new special Judge, entered an order affirming the BZA's denial of MWM's Application for Special Exception. On July 30, 2007, MWM initiated a third appeal in the case. On February 26, 2008, the Court of Appeals affirmed the BZA's denial of MWM Application for Special Exception. Rehearing and Transfer were denied.

**84D03-0502-M1-1208 (Court Took Judicial Notice)**

10. This subheading applies to facts surrounding 84D03-0502-M1-1208.

11. On or about July 13, 2004, approximately one (1) year and nine (9) months after MWM applied for a Special Exception, MWM filed an Application for Appeal of Staff Decision with the BZA, seeking to appeal the decision of the Executive Director from 2002, that a special exception

5

was necessary for the establishment of a Unit in a M-2 heavy industrial district.

12. On or about January 12, 2005, after a hearing before the BZA, the Executive Director's decision was affirmed by the BZA, and MWM's Appeal was denied. MWM sought review of that decision under Cause Number 84D03-0502-MI-1208. Once again, the Trial Court affirmed the decision of the BZA.

13. MWM appealed this decision, and on March 8, 2007, the Indiana Court of Appeals affirmed the decision of the Trial Court finding that a Special Exception was necessary for the proposed use. Rehearing and Transfer were denied.

## 84D05-0602-MI-00914 (Court Took Judicial Notice)

14. This subheading applies to facts surrounding 84D05-0602-MI-00914.

15. On September 14, 2005, MWM filed another application for the same use at the same location as the October 16, 2002[,] application described above. On or about February 9, 2006, MWM sought review of the decision of the BZA requiring MWM to extend municipal water service to the area. On July 2, 2007, the Trial Court reversed the BZA's decision requiring MWM to supply municipal water service to various land owners and granted MWM the right to begin placement of the molecular gate processing unit described in MWM application. This decision was not appealed by the BZA and since this ruling MWM has had the right to begin placement of the Unit on the proposed property and has not done so.

## 84D05-0701-MI-00589 (Court Took Judicial Notice)

16. This subheading applies to facts surrounding 84D05-0701-MI-00589.

17. On January 19, 2007, MWM filed a Declaratory Judgment seeking to establish that Indiana Code 36-7-4-1103 prevented the Area Plan Department from regulating the complete use and alienation of the mineral resources found on MWM's property.

18. On October 24, 2008, the Honorable Judge J. Blaine Akers conducted a hearing on the issue of the declaratory judgment.

19. On February 6, 2009, the Honorable Judge J. Blaine Akers issued Findings of Fact, Conclusions of Law and Judgment finding among other issues:

Finding of Fact # 13:

"That according to Charles Lee, although not cost effective, it may be possible to remove and transport the methane gas by pumping it into a truck."

A complete certified copy of the Findings of Fact, Conclusions of Law and Judgment is included in the designated materials in support of Court's Order, Judgment, and Findings of Fact, Conclusions of Law.

**84D01-0907-MI-7142**

20. This subheading applies to the facts surrounding the present case.

21. MWM contends the condition that MWM supply municipal water service to any home located within one-half (1/2) mile of any well associated with any coal mine methane processing, existing or future, effectively condemned the property of MWM.

22. Property zoned M-2, which is the same classification as the Property in this case, is permitted for the following uses: forest products processing, bottle gas storage and distribution, manufacturing of cement lime or gypsum, manufacturing of construction equipment and machinery, power plants, and rolling and extruding of metal. None of these proposed uses for property zoned M-2, which is the classification of the Property in this case, would have been subject to review by the BZA.

23. According to Charles Lee MWM was not capable of drilling wells or placing the Unit to harvest the methane gas and contracted with Mountain Petroleum Corp. out of Denver, CO for the actual work on the proposed placement of the Unit.

24. According to Charles Lee MWM was never told to not drill wells on the property by any person acting on behalf of the BZA, or any other division of Vigo County Government.

25. According to Charles Lee, the BZA, nor any other person acting on behalf of any other division of Vigo County Government, has regulated the Property, except with regards to the placement of the Unit.

26. According to Charles Lee, since the condition of providing municipal water service was struck down, there has been no impediment to harvesting the methane gas from the BZA or any other division of Vigo County Government.

27. Since July 2, 2007, MWM has not taken any action to place a unit on the Property.

28. According to Charles Lee, no person with BZA, or any other division of Vigo County Government, has physically invaded the Property.

29. According to John Newlin, the Property is not currently served by utilities.

30. According to John Newlin, the Property mainly consists of Gob Piles and is not as suitable as other properties in Vigo County for heavy industry.

31. According to Tom Hite, the methane gas is not valuable unless it is purified and is up to pipeline standards, which can occur at any point prior to placement in the pipeline.

32.    According [to] Jeremy Weir, the property has all the characteristics of being compatible with Large Tract Residential land use, or any other use permitted under M-2, heavy industrial.

33.    According to Jeremy Weir, the only thing that has been regulated on the Property of MWM is the placement of the Unit.

34.    Vigo County has not inversely condemned the Property of MWM.

## CONCLUSIONS OF LAW

A.    The Court has jurisdiction of the subject matter of this action and the parties hereto.

B.    All Findings of Fact are incorporated by reference as Conclusions of Law and all Conclusions of Law are incorporated by reference as Findings of Fact.

C.    In General, a regulatory taking must deprive the landowner of "all or substantially all economic use or productive use of property." Lingle v. Chevron USA, Inc., 544 U.S. 528, 538-540 (2005). This doctrine, as adopted by the Supreme Court of the United States, was explicitly followed by the Indiana Supreme Court in Biddle v. BAA Indianapolis, LLC, 860 N.E.2d 570, 577 (Ind. 2007).

D.    The test, as developed in Biddle, focuses on several factors including:  the economic impact of the regulation on the claimant, the extent to which the regulation interferes with reasonable investment backed expectations, and the character of the government action. Id. at 577-578. In the present case, MWM has lost nothing. At this moment, MWM has full authority to place a Unit on the Property and begin harvesting the coal bed methane. This has been the case since 2007 and MWM has done nothing to begin the process of utilizing this property interest, which they claim was inversely condemned for a period of seventeen (17) months. The BZA's determination that a special exception was necessary for the placement of a Unit has never interfered with the reasonable investment backed expectations of MWM. As Mr. Lee testified, MWM is not capable of harvesting the coal bed methane and MWM's only option was to contract with another entity, Mountain Petroleum Corp., to perform this service. Once the other entity drilled the wells, built the Unit, and started harvesting methane, the other entity would then pay MWM a certain percentage of the money generated from the sale of the coal bed methane. MWM has not expended any of its own resources, or had any other entity invest in MWM for the placement of a Unit. Lastly, the character of the government action weighs heavily in favor of the BZA. The BZA's determination that a special exception was necessary has been upheld, the initial denial of the special exception has been upheld, and the only condition which has ever been struck down was the requirement that MWM

provide municipal water service to landowners adjacent to the wells, which was only in place for a period of seventeen (17) months.

E. A landowner is not entitled to the highest and best use of his land, and a taking only occurs when the land use regulation prevents all reasonable use of the land. Dep't of Natural Res. v. Ind. Coal Council. Inc., 542 N.E.2d 1000, 1004 (Ind. 1989) cert. denied, 493 U.S. 1078 (1990). In this case, MWM has not been deprived of all reasonable use of the Property. MWM had the full ability to do anything they [sic] wanted on the Property, except the manufacture of gas which required a special exception through the BZA. The only issue that has ever even attempted to be regulated was the placement of a Unit on the Property.

F. MWM contends that a taking, even for a temporary time period, is still a taking and cites First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, as support for this proposition. In First English, the Supreme Court was being asked to determine whether an ordinance which provided: "[a] person shall not construct, reconstruct, place or enlarge any building or structure, any portion of which is, or will be, located within the outer boundary lines of the interim flood protection area located in Mill Creek Canyon," constituted a regulatory taking. Id. at 307. The ordinance in the First English case placed a complete prohibition on any construction within the Mill Creek Canyon; that is not the case here. MWM was not prohibited from doing anything[;] there was a condition requiring MWM to supply municipal water service prior to harvesting the methane, which was eventually struck down and not appealed. Furthermore, in the First English case the Supreme Court held: "We merely hold that where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." Id. at 321. The BZA has not "worked a taking of all use of the property." As established by Judge Akers' Findings of Fact, Conclusions of Law and Judgment, of which this Court took Judicial Notice: "That MWM has failed to meet its burden of proving that the Area Plan Department of Vigo County and/or the Board of Commissioners of Vigo County have prevented the complete use of the methane gas found on its property." (Conclusion of Law #7 in Judge Akers' judgment handed down February 6, 2009, included in the designated material in support of Findings of Fact and Conclusions of Law). In addition, MWM has never sought to do anything else with the Property. The placement of the Unit was the one thing MWM wanted to do on the property and for the biggest part of the procedural history of this case, all actions of the BZA have been upheld. The imposition of the condition, which was challenged and struck down, should not serve as a basis for MWM to claim the BZA removed all use of the Property.

9

G.      In Tahoe-Sierra Preservation Council, Inc., et al., v. Tahoe Regional Planning Agency, et al., 535 U.S. 302 (2002), the Supreme Court of the United States was asked to determine whether a thirty-two[-] (32[-]) month moratoria on development effected unconstitutional regulatory takings of property.  In Tahoe, the Supreme Court stated:

"An interest in real property is defined by the metes and bounds that describe its geographic dimensions and the term of years that describes the temporal aspect of owners' interest.  See Restatement of Property Section 7-9 (1936).  Both dimensions must be considered if the interest is to be viewed in its entirety.  Hence, a permanent deprivation for the owner's use of the entire area is a taking of the parcel as a whole, whereas a temporary restriction that merely causes a diminution in value is not.  Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted.  Cf. Agins v. City of Tiburon, 447 U.S., at 263, n.9 ("even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property when the proceedings ended. Mere fluctuations in value during the process of governmental decision-making, absent extraordinary delay, are 'incidents of ownership.  They cannot be considered a "taking" in the constitutional sense.'"  (quoting Danforth v. United States, 308 U.S. 271, 285 (1939)))."

In Tahoe, the Supreme Court found the thirty-two[-]month moratoria was not a compensable taking.  This is very comparable to the situation in this case.  MWM felt the condition of providing municipal water service to affected landowners was too burdensome and challenged the condition in Court.  On that point, MWM was successful and the condition was struck down in 2007.  Since that time, MWM has had the full authority to exercise [its] ability to harvest the coal bed methane and locate a unit on the Property and restore whatever value MWM claims they lost.  MWM has not done so and is attempting to claim this seventeen[-]month period where the "municipal water" condition was in place constitutes a taking, which is a misapplication of the law.

H.      In Town of Georgetown v. Sewell, 786 N.E.2d 1132 (Ind. Ct. App. 2003), the Indiana Court of Appeals stated:  "There are two (2) discrete categories of regulations that violate the Takings Clause regardless of the legitimate state interest advanced.   The first category encompasses regulations that require the property owner to suffer a physical 'invasion' of

10

his or her property. The second category encompasses regulations that deny all economically beneficial or productive use of land." Town of Georgetown at 1139. In the present case, MWM has not alleged a physical invasion of property, so the question becomes has the BZA denied MWM "all economically beneficial or productive use of land?" The answer to this question is no. Judge Akers' Findings of Fact, Conclusions of Law and Judgment, should serve as Collateral Estoppel to the issues presented in the previous cases, which are relevant to the current case. Judge Akers found that MWM had failed to meet its burden of proving the Area Plan Department/Commission of Vigo County, and the Board of Commissioners of Vigo County, has prevented the complete use of the methane gas on its Property. Furthermore, Judge Akers found, although not cost effective, it may be possible to remove and transport the methane gas by pumping it into a truck. In Eichenburger v. Eichenburger, 743 N.E.2d 370 at 375 (Ind. Ct. App. 2001), the Indiana Court of Appeals listed two factors to consider on the issue of collateral estoppel: (1) whether the party against whom the prior judgment is plead [sic] had a full and fair opportunity to litigate the issue; and (2) whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel. Id. at 375. If the two conditions are fulfilled, then the Court may apply collateral estoppel to prevent the litigation of the same issue. In this case, both of the factors have been met, and Judge Akers['] previous determination on these issues shows MWM has not been deprived of all or substantially all economic use or productive use of the Property.

I.      In Georgetown, the Court went on to state:

"To support his argument, Timothy cites to Ragucci v. Metro. Dev. Comm'n of Marion County, where the owner of an apartment building claimed that he was the victim of a regulatory taking because a zoning ordinance only allowed him to operate this apartment building as a five dwelling unity as opposed to an eight dwelling unit. 702 N.E.2d at 680. Our Supreme Court disagreed and stated that, 'it pales in comparison to the other cases in which the Supreme Court has nonetheless found no taking.' Id. at 683; see e.g., Vill. of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 384 (1926) (upholding a zoning ordinance that created a 75% diminution in value); Penn Central Trans. Co v. City of New York, 438 U.S. 104, 130 (1978) (upholding a zoning ordinance that denied property owners of a valuable property interest that significantly inhibited property owners' ability to develop the property). Moreover, Indiana courts, like the United States Supreme Court, have failed to find a taking where the regulation significantly diminished the value of the property. See e.g., Leisz, 702 N.E.2d at 1030 (failing to find a taking where '[plaintiffs'] property continues to have an economically viable use even if it is somewhat diminished'); Taylor-Chalmers, Inc. v. Bd. of Comm'rs of LaPorte County, 474 N.E.2d 531, 532 (Ind. Ct. App. 1985) (holding that

11

rezoning of plaintiff's property from 'commercial or accommodation business' to 'light industrial or agricultural' did not amount to a taking, although the plaintiff may have been denied the 'highest and best use of his land'), reh'g denied."

J.      The law is with the Respondent and against the Petitioner.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that the Board of Zoning Appeals of Vigo County and the Board of Commissioners of Vigo County have not inversely condemned the Property of Midwest Minerals, Inc.

Appellees' App. at 39-51. This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

Here, the parties requested that the trial court enter findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). When a trial court enters findings and conclusions, we apply a two-tiered standard of review: first we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. Smith v. Smith, 938 N.E.2d 857, 860 (Ind. Ct. App. 2010). "In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment." Id. We do not reweigh the evidence, and we consider only the evidence favorable to the trial court's judgment. Id. The party appealing the trial court's judgment must establish that the findings are clearly erroneous. Id. "Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made." Id. We do not defer to conclusions of law, which are evaluated de novo. Id.

12

## Issue One:  Collateral Estoppel

MWM first contends that the trial court erred when it concluded that the doctrine of collateral estoppel applied with respect to an issue determined in a prior declaratory judgment action.  Generally, collateral estoppel operates to bar a subsequent relitigation of the same fact or issue where that <u>fact or issue</u> was necessarily adjudicated in a former suit and the same fact or issue is presented in the subsequent lawsuit.  <u>Sullivan v. Am. Cas. Co. of Reading, Pa.</u>, 605 N.E.2d 134, 137 (Ind. 1992) (emphasis added).  In that situation, the first adjudication will be held conclusive even if the second action is on a different claim.  <u>Id.</u>  As the trial court in this case correctly acknowledged, we consider two factors on the issue of collateral estoppel:  (1) whether the party against whom the prior judgment is pled had a full and fair opportunity to litigate the issue; and (2) whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel.  <u>See</u> <u>Eichenberger v. Eichenberger</u>, 743 N.E.2d 370, 375 (Ind. Ct. App. 2001).  If those two elements are fulfilled, then the court may apply collateral estoppel to prevent relitigation of the same issue.  <u>Id.</u>

Here, in a prior proceeding between the same parties, MWM sought declaratory judgment on the issue of "whether MWM has proven that the Area Plan Department of Vigo County and/or the Board of Commissioners of Vigo County have prevented MWM's 'complete' use of a mineral resource outside of an urban area."[1]  Appellees' App. at 34.  The trial court found, in relevant part, that:  MWM had not drilled any wells

_____

[1]  Indiana Code Section 36-7-4-1103(c) provides:  "This chapter does not authorize an ordinance or action of a plan commission that would prevent, outside of urban areas, the complete use and alienation of any mineral resources or forests by the owner or alienee of them."  In bringing the declaratory judgment action, MWM sought relief from the requirement to obtain a special exception to build the molecular gate natural gas processing unit.

on the subject property "in an attempt to remove methane gas from the coal mines beneath the surface"; and, "although not cost effective, it may be possible to remove and transport the methane gas by pumping it into a truck." Id. at 33. And the trial court concluded in relevant part that: while the Area Plan Department of Vigo County and/or the Board of Commissioners of Vigo County were "attempting to regulate the building of a methane gas processing unit," they were not attempting to regulate "the removal, complete use, or alienation of the methane gas found on MWM's property"; and MWM had failed to meet its burden to prove that the Area Plan Department of Vigo County and/or the Board of Commissioners of Vigo County had "prevented the complete use of the methane gas found on its property." Id. at 35.

While the issue of whether a taking has occurred was not raised in the declaratory judgment action, the fact of whether the Boards had prevented the "complete use of the methane gas" found on MWM's property had been fully litigated, conclusively determined, and cannot be relitigated here. Id. We hold that the trial court properly considered that fact under the doctrine of collateral estoppel. See Sullivan, 605 N.E.2d at 137.

**Issue Two: Inverse Condemnation**

MWM contends that the trial court erred when it concluded that the Boards' actions did not constitute a taking. In particular, MWM maintains that, during the seventeen months from the date that the BZA granted the special exception subject to the public water condition until the date that the trial court struck down that condition, MWM was unable to begin construction of the molecular gate processing unit. MWM

14

asserts that it was, therefore, denied all economically beneficial or productive use of the land and is entitled to damages.

In Town of Georgetown v. Sewell, 786 N.E.2d 1132, 1138-39 (Ind. Ct. App. 2003), we explained:

> Inverse condemnation is a process provided by statute to allow persons to be compensated for the loss of property interests taken for public purposes without use of the eminent domain process. It serves to provide a remedy for takings of property that would otherwise violate [Article I,] § 21 of our state constitution and the Fifth Amendment of the United States Constitution as made applicable to the states by the Fourteenth Amendment. Specifically, Ind. Code 32-24-1-16,[] which provides the statutory remedy for inverse condemnation, states that:
>
> > A person having an interest in property that has been or may be acquired for a public use without the procedures of this article or any prior law followed is entitled to have the person's damages assessed under this article substantially in the manner provided in this article.
>
> * * *
>
> A taking includes any substantial interference with private property that destroys or impairs one's free use and enjoyment of the property or one's interest in the property. Bd. of Comm'rs of Vanderburgh County v. Joeckel, 407 N.E.2d 274, 278 (Ind. Ct. App. 1980). The Fifth Amendment to the United States Constitution, applicable to the states via the Fourteenth Amendment, guarantees that private property shall not "be taken for public use, without just compensation." Thus, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Bd. of Zoning Appeals, Bloomington, Ind. v. Leisz, 702 N.E.2d 1026, 1028 (Ind. 1998) (quoting Penn. Coal Co. v. Mahon, 260 U.S. 393, 414-415 (1922)). "Although no precise rule determines when property has been taken, the question necessarily requires a weighing of private and public interests." Leisz, 702 N.E.2d at 1028 (quoting Agins v. City of Tiburon, 447 U.S. 255, 260-61 (1980)).
>
> In Leisz, our supreme court acknowledged that there are "two discrete categories of regulations that violate the Takings Clause regardless of the legitimate state interest advanced." 702 N.E.2d at 1028. The first category encompasses regulations that require the property owner to suffer a physical "invasion" of his or her property. Id. at 1028-1029. The second

15

category encompasses regulations that deny all economically beneficial or productive use of land. Id. at 1029.

> . . .Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex set of factors, including: (1) the regulation's economic effect on the landowner, (2) the extent to which the regulation interferes with reasonable investment-backed expectations, and (3) the character of the government action. Ragucci v. Metro. Dev. Comm'n of Marion County, 702 N.E.2d 677, 683 (Ind. 1998).

Here, MWM directs us to evidence showing that the property, "though zoned M-2 industrial, had only one viable economic use, the molecular gate processing unit." Brief of Appellant at 9. And MWM asserts that the evidence does not support the trial court's finding No. 31, namely, that the methane gas found on the property could be purified and brought up to "pipeline standards . . . at any point prior to placement in the pipeline." Appellees' App. at 45. MWM maintains that the undisputed evidence shows that "it was necessary to use the molecular gate processing unit at the subject site to process the methane gas." Brief of Appellant at 10. Accordingly, MWM contends that it was "deprived of all or substantially all economic or productive use of its property[.]" Id.

First, MWM ignores the evidence that, while "not cost effective, it may be possible to remove and transport the methane gas [to be purified elsewhere] by pumping it into a truck." Appellees' App. at 33. Thus, had MWM decided to dig wells and begin harvesting the methane gas on its property, it may have been able to process the gas offsite. Second, the evidence shows that the property is available for uses including warehousing, recreational use, forestry, or a conservation club. Thus, the evidence supports the trial court's determination that MWM has not been deprived of all economic or productive use of the property. See, e.g., Town of Georgetown, 786 N.E.2d at 1140

16

(holding property had economically viable use where evidence showed tract could be used for grazing or recreational purposes).

Next, we look at the three factors set out in Ragucci, namely: (1) the regulation's economic effect on the landowner, (2) the extent to which the regulation interferes with reasonable investment-backed expectations, and (3) the character of the government action. 702 N.E.2d at 683. With respect to the economic effect, we first observe that MWM did not purchase the subject property for the purpose of harvesting and processing methane gas in the first instance. Charles Lee testified that MWM had purchased the property, which was not "of particular value," in "an attempt to kind of get control of things and maybe figure out how to clean the area up [after years of coal mining, which operations had ceased]." Transcript at 11. MWM bought the property in 1981, but there is no evidence that it did anything with the property for decades. Then, in August 2000, MWM entered into a contract with Mountain Petroleum, Corp. ("Mountain Petroleum") "to explore and develop" the "Oil and Gas Leases and/or Oil and Gas Interests in the land[.]" Plaintiff's Exh. 7. And in 2002, MWM first applied for a special exception to build a molecular gate natural gas processing unit. After that application was denied, MWM waited until 2005 to file a second application for special exception. Given the number of years that MWM has owned the subject property without using it for any purpose, and given that there appeared to be no urgency in getting the special exception approved, MWM cannot show a significant economic effect as a result of the alleged taking.

17

With respect to the alleged impact on reasonable investment-backed expectations, the evidence shows that any impact was insignificant. Again, there is no evidence of any contractual deadlines for beginning construction on the molecular gate processing unit, and, by the time that the public water condition was implemented in February 2006, more than five years had passed since MWM and Mountain Petroleum had executed their contract. Moreover, the condition was struck down in July 2007, yet Mountain Petroleum has yet to start construction on the processing unit, and no wells have been dug. Lee testified that there were two reasons that nothing had been done with the subject property to date: the delay while the public water condition was in place; and "a business decision" since "by then gas prices were going down[.]"[2] Transcript at 40. Lee testified further that Mountain Petroleum "still [has] the ability to do something[.]" Id. at 43. There is no evidence that Mountain Petroleum canceled its contract with MWM as a result of the alleged taking. Indeed, there is no evidence that Mountain Petroleum would have built the processing unit had the public water condition not been implemented in the first instance.

Finally, the character of the government action in this case supports the trial court's conclusion that there was no taking. While the public water condition was ultimately struck down, the BZA implemented it believing it to be in the best interests of the public health. As the United States Supreme Court has observed, zoning laws are generally "viewed as permissible governmental action even when prohibiting the most

_____

[2] Lee testified that while natural gas prices were $8 to $12 per unit in 2006-2007, prices are now as low as $2 per unit.

beneficial use of the property." See Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 125 (1978).

Again, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. Smith, 938 N.E.2d at 860. MWM's appeal amounts to a request that we reweigh the evidence, which we will not do. The trial court did not err when it concluded that the seventeen-month period from the time that the public water condition was implemented until it was reversed did not constitute inverse condemnation.

Affirmed.

FRIEDLANDER, J., and BRADFORD, J., concur.