FILED

Apr 18 2019, 10:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

C. Gregory Fifer
F. Brad Benson
Applegate Fifer Pulliam LLC
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE
CLARK COUNTY BOARD OF
ZONING APPEALS

Douglas B. Bates
Chelsea R. Stanley
Stites & Harbison PLLC
Jeffersonville, Indiana

Zachary M. VanVactor
Stites & Harbison PLLC
Louisville, Kentucky

ATTORNEYS FOR APPELLEE
SIERRA CLUB

Khushi K. Desai
Earthjustice
Washington, D.C.

Jeffrey B Hyman
Conservation Law Center
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Essroc Cement Corp,

*Appellant-Petitioner,*

v.

Clark County Board of Zoning
Appeals and Sierra Club,

*Appellees-Respondents*

April 18, 2019

Court of Appeals Case No.
10A04-1709-PL-2199

Appeal from the Clark Circuit
Court

The Honorable Susan L. Orth,
Special Judge

Trial Court Cause No.
10C02-1609-PL-108

**May, Judge.**

[1] Essroc Cement Corporation ("Essroc") operates in Clark County, Indiana, on land zoned M2 for Heavy Industrial Use. To date, Essroc has always used coal to power its concrete production, but in the past decade Essroc began considering firing its concrete kiln with liquid waste derived fuels ("LWDF"). In December 2014, Essroc requested an informal determination from the Clark County Plan Commission ("the Plan Commission") about the permissibility of burning LWDF on land zoned M2. In late January 2015, the executive director of the Plan Commission gave Essroc a private letter indicating the burning of LWDF was permitted in an area zoned M2.

[2] However, seventeen months later, Plan Commission staff issued a second private letter to Essroc that revoked the first private letter and indicated Essroc would need to obtain a variance or re-zone its property to an M3 district if it wished to burn LWDF. Essroc appealed that second private letter to the Clark County Board of Zoning Appeals ("the CCBZA"). The CCBZA held a public

hearing and determined Essroc's proposed use of LWDF is prohibited in an area zoned M2. As a result, to burn LWDF, Essroc would need either to re-zone to M3, which is a Hazardous Waste Disposal District, or to petition for a use variance.

[3] Essroc petitioned the trial court to review that administrative determination. The trial court affirmed the CCBZA's decision. Essroc filed a motion to correct error, which the trial court granted in part and denied in part. Essroc now appeals to this court, raising numerous procedural and substantive issues[1] that we reorganize and restate as:

> I. Does the Clark County Zoning Ordinance ("CCZO") permit the burning of LWDF on land zoned M2 or only on land zoned M3?

> II. Can Essroc nevertheless burn LWDF on its land zoned M2 because such burning is permitted as an "accessory use"?

> III. Does Plan Commission staff have the authority to revoke a prior staff-issued, non-public, informal zoning determination letter by sending another staff-issued letter?

---

[1] In its Brief, Essroc also asserted the trial court committed reversible error by failing to hold a hearing, as requested by the parties, prior to ruling on the competing motions for summary judgment. At oral argument, counsel for Essroc withdrew that issue from our consideration by conceding that any error that occurred thereby was harmless as the trial court held a full hearing prior to ruling on Essroc's motion to correct error.

IV. If Plan Commission staff could revoke the initial staff determination, was Essroc entitled to notice and a public hearing before that revocation?

V. Is the CCBZA equitably estopped from requiring Essroc to rezone because Essroc had spent money in reliance on the Plan Commission's first determination letter?

VI. Should Finding 18, Finding 19, and Conclusion 7 be struck from the trial court's final order because the issue of whether the CCZO is preempted by federal law was not before the trial court?

We affirm.

# Facts and Procedural History[2]

[4] For over 100 years, Essroc has produced cement at its facility in Clark County, Indiana. To date, Essroc has fired its cement kiln using coal. However, Essroc wishes to begin firing its kiln with LWDF, which are an amalgam made of such liquids as household cleaning products, oils, nail polish, nail polish remover, perfume, paint, and ink. To burn LWDF, Essroc needs a permit from the Indiana Department of Environmental Management ("IDEM"), and to obtain that IDEM permit, Essroc needs a letter confirming it has CCBZA approval for converting from coal to LWDF.

---

[2] We held oral argument on this case at the Indiana Statehouse on June 20, 2018. We thank counsel for their insightful arguments, which assisted our resolution of this proceeding.

On December 19, 2014, Essroc's legal counsel sent a letter to the Plan Commission asking "for certification of zoning compliance from the Clark County Plan Commission and/or Plan Director":

> This firm represents Essroc. Essroc's production facilities at Speed are located on approximately 3500 acres in the unincorporated territory of Clark County with the manufacturing and production of the facility within the M2 (Heavy Industrial) zoning district as shown on the Clark County Zone Map.

> To date Essroc has fueled its production facilities primarily with coal. It proposes to begin supplementing its coal usage with alternative fuels. These materials would include solvents, paints, etc. They would be flammable (as required to create heat for the kiln), and would be accordingly designated as "hazardous" due to such flammability. The alternative fuel materials would be delivered by generators to Essroc's Logansport, Indiana, plant for blending. This plant already has a permit to burn alternative fuels, and therefore presently has all of the equipment in place as required to properly handle these materials.

> After blending at the Logansport plant, the materials would be transported by truck to the Speed plant. Essroc already has one (1) tank in place that it has used for waste oils in the past. The only capital addition Essroc currently proposes to make would be the addition of a second tank to enable replacement of up to fifty percent (50%) of the coal it now uses. However, Essroc presently anticipates that it will likely achieve replacement of coal in the 25-30% range, but plans to seek IDEM permitting to allow up to the 50% replacement level. The addition of this single tank is obviously a very small addition to Essroc's existing plant. Once the materials arrive at the Speed plant, they will be pumped into the existing and new tanks, and then pumped to the kiln utilizing existing equipment to use as a process fuel in manufacturing clinker, a work-in-process that ultimately becomes cement.

Enclosed are the materials that Essroc has provided to adjoining property owners as part of the environmental permitting process. Please not [sic] the graphic on page 4 illustrating the cement manufacturing process entitled "Cleaner Alternative Fuels Can Replace Coal". [sic] Again, the only change in Essroc's current production activities relates to the Alternative Fuel graphic on the right hand side of this page, as Essroc plans to replace a portion of the coal used in its kiln with such alternative fuels.

Essroc needs to demonstrate to IDEM that, if permitted, its plans will comply with all local zoning regulations. Permitted uses (g) ("concrete mixing", etc.), and (h) ("sand, gravel or aggregate wash production or processing") would appear to expressly permit the continued operation of Essroc's cement production facilities, regardless of whether alternative fuels are utilized as a supplement to coal. Essroc does not in any manner intend to construct or operate any facilities constituting a "landfill, waste transfer facilities, recycling facilities and related operations, or storage processing and recycling of hazardous materials" that would most likely require rezoning to M3 (Hazardous Waste Disposal District).

Based on the foregoing, Essroc would request the issuance of an assurance letter by the Plan Directoor [sic] and/or on behalf of the Plan Commission (in the manner you deem appropriate), certifying that (i) Essroc's current cement manufacturing operations are permitted as a matter of right, (ii) such operations will continue to be permitted as a matter of right subsequent to Essroc's conversion to alternative fuels usage; provided however, that Essroc complies with all applicable laws, regulations, and permits with respect to the handling and usage of such alternative fuels, and (iii) Essroc's use of such alternative fuels will not necessitate a change of zoning classification to M3 (Hazardous Waste Disposal District) for any portion of its facilities.

Should the Plan Commission or you require any additional information in order to be able to issue the requested assurance letter, please advise and we will attempt to accommodate your request promptly. Essroc representatives and I would also be glad to meet with the Plan Director, yourself, or other appropriate County officials as required to satisfy any remaining concerns regarding this request.

(App. Vol. II at 53-4.)

[6] Essroc and Plan Commission staff held informal meetings and, on January 26, 2015, the Executive Director of the Plan Commission sent a letter to Essroc that stated:

> The Office of Planning & Zoning for Clark County[,] Indiana concludes after our meeting on January 22, 2015, that Essroc's current cement manufacturing operation is permitted as a matter of right within the M2 (Heavy Industrial) district in which it is located. Such operations will continue to be permitted as a matter of right subsequent to Essroc's conversion to RCRA-regulated Liquid Waste Derived Fuels (kiln-ready fuel) usage at this site location as described and detailed to the Office of Planning, provided that Essroc complies with all applicable laws, regulations, permits, and local ordinances with respect to the handling, usage, and location of such alternative fuel. Essroc's use of such alternative fuels will not require a rezoning to M3 (Hazardous Waste Disposal District) for any portion of its facilities or the grant of any use variance.
>
> The new storage tank and shed over the existing tank farm will require commercial building permits issued through the Office of Planning & Zoning by the Building Commissioner after all approvals or permits are received from other agencies, including the Indiana Department of Natural Resources for the approval of

the location of the items in the floodway . . . and the Indiana Department of Environmental Management (IDEM) for the modifications to the Essroc facility for the construction of, and operations for, the use of these alternative fuels as specified in the RCRA and Clean Air Act permit applications to be prepared and submitted by Essroc.

(*Id*. at 61.)

[7]     In February 2016, IDEM held a meeting on Essroc's permit application for burning of LWDF. (*Id*. at 46.) At the next Plan Commission meeting, a group of Clark County citizens ("Concerned Citizens")[3] raised concerns about Essroc burning LWDF:

> The Essroc Cement Corporation (Essroc) has applied for a modification of its Part 70 Clean Air Act permit that would allow it to burn liquid hazardous wastes that require comprehensive regulation under the Resource Conservation and Recovery Act (RCRA) at its Sellersburg, Indiana cement plant. RCRA is a federal law governing the generation, storage, transport and disposal of regulated hazardous wastes, which are among the most highly toxic substances produced in industrial manufacturing and business use. The Essroc plant is located in close proximity to homes, churches, schools, and daycare centers, and its permit application documents reveal that it already emits vast quantities of toxic pollution into the neighboring community – even without burning hazardous waste. Allowing the plant to burn hazardous waste would increase the toxic burden on families in this community, and would also create the risk of catastrophic events if the hazardous

---

[3] Concerned Citizens includes Carl A. Dreyer, Teri Corya, Chuck Corya, Vicki Whittinghill, and Karl Truman. (*See* App. Vol. II at 101.)

waste that Essroc seeks to store on site – which, by Essroc's admission is volatile and ignitable – should spill, leak, catch fire, or explode. Hazardous waste is dangerous to handle, transport, store, and incinerate because it consists of highly toxic chemicals in complex harmful mixtures.

(*Id*. at 66) (first paragraph of a ten-page submission to CCBZA).

[8] On April 4, 2016, Concerned Citizens filed a petition with the CCBZA for administrative appeal of the letter of January 26, 2015. (*Id*. at 81-3.) The CCBZA dismissed that appeal because staff decisions must be appealed within thirty days, such that the letter of January 26, 2015, was "not an appealable administrative decision." (*Id*. at 122.) On June 17, 2016, Concerned Citizens filed a petition for judicial review by the Clark Circuit Court. (*Id*. at 101-12.) Essroc moved to intervene in that court case and then, on August 10, 2016, the case was dismissed with prejudice by joint agreement of Concerned Citizens, Essroc, and the CCBZA.

[9] However, in the meantime, on June 27, 2016, the new Acting Executive Director of the CCBZA, Stacia Franklin, and the President of the Plan Commission, Jack Coffman, sent a letter to Essroc that provided, in necessary part:

> In correspondence dated December 19, 2014, counsel for Essroc requested that the Clark County Plan Commission or the Plan Director issue a letter of assurance related to Essroc's current manufacturing operations and proposed future operations. In that letter Essroc stated:

"Essroc does not in any manner intend to construct or operate any facilities constituting a landfill, waste transfer facilities, recycling facilities and related operations or storage processing and recycling of hazardous materials' that would most likely require rezoning to M3 (hazardous waste disposal) district."

The staff of the office of Planning and Zoning for Clark County relied on the representations of Essroc's letter and issued the requested assurances in a letter dated January 26, 2015 subject to the further requirements stated in the assurance letter.

Clark County has just recently discovered that on February 26, 2015, Essroc submitted to IDEM, an initial part B permit application ("RCRA Permit") (VFC#80012744) for the Esroc [sic] Speed, Indiana facility to request addition of a LWDF process to the Speed facility. On the "Type of Application" section, Essroc designated "Hazardous Waste Storage Facility; Hazardous Waste Treatment Facility". [sic] Additionally, in February of 2015, Essroc applied for a significant modification of its Part 70 Operation Permit ("Title V Permit") in order to begin utilizing LWDF. IDEM's preliminary findings conclude that Essroc will construct a RCRA LWDF waste receiving and storage facility at the Speed, Indiana facility.

Therefore, the Office of Planning and Zoning of Clark County, Indiana still concludes that Essroc's current cement manufacturing operation is permitted as a matter of right but based upon these newly discovered facts, in order to add the uses which are the subject of IDEM approval, Essroc must file for rezoning to an M-3 zone and/or file for a variance prior to any such use at its Speed facility.

(*Id*. at 126-7.)  Essroc filed a petition with the CCBZA for administrative appeal of that Determination.  The CCBZA held a hearing and then affirmed the Determination in an order that provided, in necessary part:

> 2.      This action was brought by Essroc pursuant to I.C. 36-7-4-918.1 (1) claiming to be aggrieved by the Determination relating to its intended burning of hazardous materials, and the requirement that Essroc file a petition to rezone its real estate from its present M-2 zoning to an M-3 zoning designation or in the alternative to file a Petition for a use variance of its real estate to burn hazardous wastes, to store hazardous wastes and treat hazardous wastes.  The contents of the Determination are incorporated herein by reference as if full [sic] set out herein.

> 3.      This action is necessary and is also brought pursuant to Article XXII of the Clark County Zoning Ordinance (the "Ordinance")[.]

> 4.      The real estate which is the subject of this appeal is that of Essroc at 301 U.S. 31 Sellersburg, Indiana (the "Real Estate"), is currently zoned "M2 (Heavy Industrial)" and has been so zoned at all pertinent times.

> 5.      On January 26, 2015, without a public hearing and/or public meeting, but apparently in a meeting with Essroc on January 22, 2015, the then Executive Director of the Clark County Plan Commission, Michael Tackett issued a determination that Essroc Cement was able to, as a matter of right, burn regulated liquid waste-derived fuel at its location without a zoning change and/or a zoning variance from its M2 zoning district (the "Interpretation").

6.      The "M2 (Heavy Industrial)" in the Ordinance does not allow the destruction or recycling [or] the burning of hazardous waste.

7.      The Intentions of Article XVI: M2 Heavy Industrial in the Ordinance state:

Heavy industrial district is intended for those heavy industrial uses that are typically characterized by objectionable factors which are exceedingly difficult to eliminate.  These industries are therefore buffered by efficient [sic] areas that minimize any adverse effects and wherever practical the district is removed as far as possible from residential areas buffered by intervening industrial districts.

8.      Pursuant to the Ordinance the only zoning district in Clark County, Indiana allowing the burning of hazardous waste is an "M3 Hazardous Waste Disposal District" in Clark County, Indiana, and the same is described in Article XVII of the Ordinance.

9.      The Intentions of Article XVII: M3 Hazardous Waste Disposal District in the Ordinance state:

This district is restricted to facilities for the disposal, destruction, or recycling of toxic chemicals, radioactive wastes, heavy metals, asbestos or other forms of hazardous waste whether through incineration, land filling, or other mechanical, chemical, or technological means.

10.     Under "Permitted Uses" in Article XVII (M3) the Ordinance further provides in pertinent part: "No building,

structure or premises shall be used, arranged or designed to be use[d] except for one or more of the following uses:

> (e) Storage processing and recycling of hazardous materials."

11. Additionally under the Ordinance the M3 district requires special setback requirements: "No M3 use shall be located within one mile of any business, residence, church, school, health care facility, or child care facility as measured from the point of admission discharge or regulate[d] activity to the nearest property line."

12. In a letter to David Nachand dated December 19, 2014, Essroc's counsel (the "Essroc Letter") acknowledges the alternative fuels ("solvents, paints, etc . . .") are "hazardous" and further indicates these hazardous materials would be "transported by truck" to Essroc's Speed, Indiana facility from its Logansport facility then stored at the Speed, Indiana facility until pumped for processing as fuel.

13. Additionally in the Essroc Letter to David Nachand, Essroc's counsel represented, it "does not in any manner intend to construct or operate facilities constituting a landfill, waste transfer facilities, recycling facilities and related operations or storage processing and recycling of hazardous materials that would most likely require rezoning to M# [sic] (hazardous waste disposal) District."

14. As background evidence reveals, in 1993 the Clark County Commissioners responded/reacted to the very same issue after Essroc had applied for a similar permit in 1992 to burn hazardous waste at its Speed, Indiana facility by the passage of the M3 zoning designation.

15.	In principle Essroc's present intended use is no different than its 1992 request to burn hazardous fuels and since that time the Clark County Commissioners enacted legislation governing hazardous materials in the County and created the M3 district in the Ordinance.

16.	The Interpretation by the then Executive Director's [sic] was based upon the representations made in the Essroc Letter by Essroc's counsel.

17.	That the Interpretation of the then Executive Director of the Plan Commission was the result of a private meeting (not a public meeting or hearing) and without notice to neighboring property owners as required by notice requirements of the Ordinance pertaining to Essroc's requested burning of hazardous materials in violation of the Ordinance.

18.	The Interpretation by the then Executive Director was improper [and] incorrect[,] as the intended use by Essroc, according to its own filing with the Indiana Department of Environmental Management ("IDEM") for a RCRA Permit (VFC#80012744) its new intended use [sic] stated it as a "Hazardous Waste Storage Facility; Hazardous Waste Treatment Facility."

19.	Essroc in February of 2015 also applied to modify (significantly) it[s] Part 70 Operation Permit ("Title V Permit") to begin utilizing LWDF. The preliminary findings of IDEM conclude that Essroc will construct a RCRA LWDF waste receiving and storage facility at it[s] Real Estate.

20.	The proposed use by Essroc is a prohibited use in an M2 zoning district in Clark County, Indiana.

21.     The Determination should be affirmed in all respects requiring Essroc to file a Petition for Rezoning [of] the Real Estate or a Petition for a Use [V]ariance for its intended uses which are the subject of the IDEM approval.

22.     If either Petition is filed by Essroc the Plan Commission or the Board of Zoning Appeals shall give the proper statutory considerations pursuant to I.C. 36-7-4-603 or 36-7-4-918.4 respectively to the petition(s) filed.

23.     This decision is a "Zoning Decision" as the same is defined by I.C. 36-7-4-1016, and is subject to "Judicial Review" pursuant to I.C. 36-7-4-1600 *et seq*.

(*Id*. at 185-8.)

[10]     Essroc petitioned the trial court for review on September 14, 2016. The CCBZA answered that petition on September 20, 2016. On December 13, 2016, the certified administrative record was filed. Sierra Club thereafter petitioned the court to intervene as a respondent, and on February 3, 2017, the trial court granted Sierra Club's motion to intervene. On April 24, 2017, Essroc moved for summary judgment. On June 21, 2017, CCBZA moved for dismissal and for summary judgment against Essroc, and Sierra Club moved for summary judgment against Essroc. On July 18, 2017, Essroc filed a summary judgment reply brief and a motion for a summary judgment hearing.

[11]     On July 24, 2017, the trial court affirmed the decision of the CCBZA in an order containing findings and conclusions. (*See* App. Vol. IV at 94-8.) On August 22, 2017, Essroc filed a motion to correct error. The trial court held a

hearing, *see supra* n.1, and then, on September 7, 2017, affirmed its judgment in favor of the CCBZA. (*See id.* at 129-30.) The order on rehearing also modified one of the trial court's findings, number 18, from its original judgment, which we will explain in more detail when we reach Essroc's final issue on appeal.

# Discussion and Decision

[12] Essroc appeals following the trial court's affirmation of the CCBZA's decision. When reviewing a zoning board's decision, we are bound by the same standard of review as the trial court. *Flat Rock Wind, LLC v. Rush Cty. Area Bd. of Zoning Appeals*, 70 N.E.3d 848, 857 (Ind. Ct. App. 2017), *trans. denied*. The trial court is not permitted to conduct a trial *de novo*, and instead neither that court nor this one may reweigh the evidence or reassess the credibility of witnesses. *Id*. We may grant relief from the zoning board's decision

> . . . only if the court determines that a person seeking judicial relief has been prejudiced by a zoning decision that is:
>
> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (2) contrary to constitutional right, power, privilege, or immunity;
>
> (3) in excess of statutory jurisdiction, authority or limitations, or short of statutory right;
>
> (4) without observance of procedure required by law; or

(5) unsupported by substantial evidence.

Ind. Code § 36-7-4-1614(d). "The burden of demonstrating the invalidity of a zoning decision is on the party to the judicial review proceeding asserting invalidity." Ind. Code § 36-7-4-1614(a). Thus, Essroc has the burden on appeal to demonstrate error by the CCBZA.

### I. Does the CCZO permit the burning of LWDF on land zoned M2 or only on land zoned M3?

[13] "Construction of a zoning ordinance is a question of law." *Flying J., Inc. v. City of New Haven, Bd. of Zoning Appeals*, 855 N.E.2d 1035, 1039 (Ind. Ct. App. 2006), *reh'g denied*, *trans. denied*. Regulations that impair the use of real property are strictly construed because they "are in derogation of the common law." *Id*. We therefore will not extend zoning regulations by implication. *Id*.

[14] When we must construe a zoning ordinance, we apply the same rules of construction that we use on statutes. *Flat Rock Wind*, 70 N.E.3d at 857. Specific ordinances control over general ordinances, and ordinances that "relate to the same general subject matter" should be construed together. *Id*.

> [T]he express language of the ordinance controls our interpretation and our goal is to determine, give effect to, and implement the intent of the enacting body. When an ordinance is subject to different interpretations, the interpretation chosen by the administrative agency charged with the duty of enforcing the ordinance is entitled to great weight, unless that interpretation is inconsistent with the ordinance itself. If a court is faced with two reasonable interpretations of an ordinance, one of which is supplied by an administrative agency charged with enforcing the

ordinance, the court should defer to the agency. Once a court determines that an administrative agency's interpretation is reasonable, it should end its analysis and not address the reasonableness of the other party's interpretation. Terminating the analysis reinforces the policies of acknowledging the expertise of agencies empowered to interpret and enforce ordinances and increasing public reliance on agency interpretations.

*Hoosier Outdoor Advert. Corp. v. RBL Mgmt., Inc.*, 844 N.E.2d 157, 163 (Ind. Ct. App. 2006) (internal references omitted), *trans. denied*.

[15] The CCBZA's decision provided in relevant part:

> 6. The "M2 (Heavy Industrial)" in the Ordinance does not allow the destruction or recycling [or] the burning of hazardous waste.

> * * * * *

> 8. Pursuant to the Ordinance the only zoning district in Clark County, Indiana allowing the burning of hazardous waste is an "M3 Hazardous Waste Disposal District" in Clark County, Indiana, and the same is described in Article XVII of the Ordinance.

> * * * * *

> 18. The Interpretation by the then Executive Director was improper [and] incorrect[,] as the intended use by Essroc, according to its own filing with the Indiana Department of Environmental Management ("IDEM") for a RCRA Permit (VFC#80012744) its new intended use [sic] stated it as a "Hazardous Waste Storage Facility; Hazardous Waste Treatment Facility."

19.    Essroc in February of 2015 also applied to modify (significantly) it[s] Part 70 Operation Permit ("Title V Permit") to begin utilizing LWDF.  The preliminary findings of IDEM conclude that Essroc will construct a RCRA LWDF waste receiving and storage facility at it[s] Real Estate.

20.    The proposed use by Essroc is a prohibited use in an M2 zoning district in Clark County, Indiana.

21.    The Determination should be affirmed in all respects requiring Essroc to file a Petition for Rezoning [of] the Real Estate or a Petition for a Use [V]ariance for its intended uses which are the subject of the IDEM approval.

(App. Vol. II at 186, 188.)

[16]    Essroc asserts "that its proposed use of alternative fuels is a permitted use as a matter of right in the M2 district." (Reply Br. at 21.)  The CCZO defines a "permitted use" as the "uses[4] which are allowed within a specific zoning district." (App. Vol. III at 20 (footnote added).)   The CCZO explains the "M2 Heavy Industrial" district to have the following intention and permitted uses:

> **Intention of District** – Heavy industrial district is intended for those heavy industrial uses that are typically characterized by objectionable factors which are exceedingly difficult to eliminate. These industries are therefore buffered by efficient [sic] areas that minimize any adverse effects and wherever practical this district

---

[4]  A "use" is defined as the "purpose or activity for which the land or building thereon is designed, arranged or intended, or for which it is occupied or maintained." (App. Vol. III at 23.)

is removed as far as possible from residential areas buffered by intervening minor industrial districts.

**Permitted Uses** – No building[,] structure[,] or premises shall be used, arranged[,] or designed to be used except as one or more of the following uses:

(a) Any use permitted in the M1 district (with the exception of Day Care Centers and Churches);[5]

(b) Creosote manufacturing and treatment of petroleum products;

---

[5] Uses permitted in the M1 district include:

(a) Any permitted in the B2 or B3 districts (no residential uses); (b) Engineering or research laboratories, vocational or industrial training facilities, data processing or analysis; (c) Light manufacturing including processing, refining, fabricating, assembly cleaning, testing, or repairing of goods, materials or products; (d) Enclosed wholesaling and warehousing packaging, storage or distribution facilities; (e) General offices associated with an industrial use including service facilities for employees or 1[sic] guests provided that any service facility shall be entirely enclosed within a building; (f) Utility installations and facilities; (g) Accessory uses which are incidental or commonly associated with the operation or permitted use including recreational areas for employees, lodging facilities for owners, guards, or care takers; (h) Bakeries, secondary food processing, milk processing, manufacture and bottling of dairy products and beverages; (i) Machine, welding, tool and die shops and electroplating operations; (j) Manufacture of cloth, jewelry and leather products; (k) Biological, medical and cosmetic manufacturing; (l) Manufacture and assembly of optical goods, musical and recording instruments, office machinery, electrical and mechanical; (m) Manufacture and assembly of marine, office, household appliances, furniture, communication and automobile equipment, air conditioning, heating, and refrigeration equipment; (n) Can and container manufacture, processing and milling of forest products; (o) Dyeing and cleaning works and services such as linen suppliers, freight movers and communication and canteen operations; (p) Trucking and railroad terminals; (q) Upholstering and leather goods manufacture; (r) Cannery, bottling, processing, and packaging of food and beverages, granaries, grain processing, meat processing and starch manufacture; (s) Vehicle impound lots with no more than one (1) vehicle per 30 square feet of outdoor vehicle storage space (excluding stacking of vehicles) located entirely on concrete or adphalt [sic], fenced on all sides, and with no license plate expired more than thirty (30) days. This use shall not include parking lots[;] (t) Other uses comparable and compatible to those set forth in in this Article.

(App. Vol. III at 43-4) (formatting altered).

(c) Foundry, smelting operations, metal forging, fabricating, rolling and stamping operations;

(d) Boiler manufacturing, structural steel fabricating, general manufacturing assembly plants;

(e) Railroad equipment manufacturing, repair and service yards.

(f) Manufacturing of soaps, pharmaceutical paper products, manufacturing of malt products, brewing distillation of liquor and spirits, poultry hatchery, stone works and stone cutting, thermal, electric, and steam power plants;

(g) Concrete mixing, production of concrete blocks and shapes, cinder blocks and other similar building materials manufactured;

(h) Mining, extraction, washing, and processing of sand, gravel, and other minerals;

(i) Manufacture and assembly of glass, plastic and rubber products and implements;

(j) Manufacture of colors, dye, paint and other coatings, and tar products;

(k) Other uses comparable and compatible to those set forth in this Article.

(l) Municipal solid waste landfill (non-hazardous) as defined by 329 IAC 10-2-116, as the same may be amended from time-to-time.

(App. Vol. III at 46) (emphases in original) (footnote added). Contrary to Essroc's assertion, the storage and burning of hazardous materials does not fit into any one of the Permitted Uses listed for the M2 district.

[17] The CCBZA determined the only zoning district that would permit the burning of hazardous wastes is the M3 district. According to the CCZO, the intention of and permitted uses in an "M3 Hazardous Waste Disposal District" are:

> **Intention of District** – This district is restricted to facilities for the disposal; [sic] destruction, or recycling of toxic chemicals, radioactive wastes, heavy metals, asbestos and other forms of hazardous waste whether through incineration, land filling, or other mechanical, chemical, or technological means.
>
> **Permitted Uses** – No building, structure or premises shall be used, arranged or designed to be used except for one or more of the following uses:
>
>> (a) Any use permitted in the M2 district (no Day Care Centers or Churches);
>>
>> (b) Landfill;
>>
>> (c) Waste transfer facilities;
>>
>> (d) Recycling facilities and related operations;
>>
>> (e) Storage[,] processing[,] and recycling of hazardous materials.

(*Id.* at 49) (emphases in original).

[18]     Essroc first claims that "by the clear and unequivocal terms of the provisions of the Zoning Ordinance, the receiving and storage of waste, in and of itself, is insufficient to mandate rezoning to M3." (Br. of Appellant at 31.) However, this claim begins with a faulty factual premise as Essroc does not intend to simply receive and store LWDF. Essroc intends to pump the stored LWDF to its kiln and burn it as fuel in the kiln.

[19]     Essroc next argues its conversion to LWDF as an alternate fuel for its kiln does not fit into any of the M3 Permitted Uses because it is not engaging in "[s]torage[,] processing[,] and recycling of" LWDF. (*See* App. Vol. III at 49.) Because that pertinent phrase from the ordinance contains the "and" conjunction, Essroc asserts, the "plain, ordinary, and obvious meaning of the phrase 'storage processing **and** recycling of hazardous materials' dictates that Essroc would have to be engaging in the totality of these acts in order to require M3 zoning to permit them." (Br. of Appellant at 32 (emphasis in original).) Essroc does not explain which of those three acts it does not believe it will be performing and, as such, has not demonstrated error. *See Kentucky Nat. Ins. Co. v. Empire Fire & Marine Ins. Co.*, 919 N.E.2d 565, 586 (Ind. Ct. App. 2010) (when party fails to explain how law applies to evidence, it has not demonstrated error in the appealed decision).

[20]     Nevertheless, it seems apparent that Essroc intends to store, process, and recycle liquid hazardous waste. Essroc's proposal indicated it would build additional storage tanks to hold the LWDF, *see storage*, Webster's Third New International Dictionary Unabridged 1976 at 2252 (G. & C. Merriam Co. 1976)

("the safekeeping of goods in a warehouse or other depository"); pump the LWDF through pipes from the storage tanks to the kiln, *see process*, *id*. at 1808 ("to move along: GO; *esp*: to move along in or as if in a procession") (emphases in original);[6] and burn the hazardous waste as a fuel for production of concrete. *See recycle*, www.dictionary.com/browse/recycling# (last visited March 12, 2019) ("to alter or adapt for new use without changing the essential form or nature of" or "to use again in the original form or with minimal alteration").

[21] Finally, CCBZA notes that Essroc's plan to store LWDF, pump it to the kiln, and burn it as fuel fits squarely within the intention for which the M3 district was created – "for the disposal[,] destruction, or recycling of toxic chemicals . . . and other forms of hazardous waste whether through incineration, land filling, or other mechanical, chemical, or technological means." (Appellant's App. Vol. III at 49.)

[22] For all these reasons, we affirm the CCBZA's findings that Essroc's burning of hazardous waste is prohibited in the CCZO's M2 district but permitted in its M3 district.

---

[6] Processing can also indicate actions taken to alter a product. www.dictionary.com/browse/processing ("to treat or prepare by some particular series of actions") (last visited March 20, 2019). If processing is given this meaning, then it is redundant with recycling. www.dictionary.com/browse/recycling?s=t ("to treat or process (used waste materials) so as to make suitable for reuse") (last visited March 20, 2019).

### II. Can Essroc nevertheless burn LWDF on its land as an "accessory use"?

[23] Essroc asserted to the CCBZA that its proposed use of LWDF should be "permitted as an accessory use as a matter of law." (App. Vol. II at 149) (capitalization removed). The CCBZA rejected Essroc's accessory use argument when entered an order that affirmed the staff decision of June 27, 2016, prohibiting Essroc from using LWDF without obtaining a variance or re-zoning its property.

[24] On appeal, Essroc first notes "Indiana recognizes the doctrine of accessory use, under which the right to establish and maintain a commercial or nonresidential use normally includes the right to add accessory uses which are secondary to the permitted one." (Br. of Appellant at 36.) Essroc then argues the accessory use of LWDF should be permitted on its property because: (1) "Essroc's long-standing primary use (i.e., cement production) would continue without change," (*id*.), and (2) that "accessory use will not in any manner alter or change the character of the primary use to one which requires a change of zoning designation to M3 (Hazardous Waste Disposal)." (*Id*. at 37.) In support of that argument, Essroc cites *Flying J.*, in which we determined the overnight parking for RVs and Semi-trucks was a permissible accessory use of a travel plaza because such parking "would be subordinate to the primary uses of

the travel plaza and would not change the character of the travel plaza." 855 N.E.2d at 1043.[7]

[25] We cannot, however, agree with Essroc that burning of LWDF can be permitted as an accessory use in the M2 district (or any other zoning district in Clark County, for that matter).[8]

> We note that one long-standing rule of statutory construction is that expressed in the principle *expressio unius est exclusio alterius*, which means that the enumeration of certain things in a statute necessarily implies the exclusion of all others. This principle is particularly appropriate where the same term is present in certain portions of the same enactment, but not in other portions. . . . [W]here an ordinance specifically lists a use in one category but not another, that use will be assumed a permitted use only in the category where it is mentioned.

---

[7] We applied that two-part test in *Flying J.* because the New Haven Zoning Code defined "accessory use" as a "building or use subordinate to another structure or use located on the same lot and which does not change or alter the character of the premises." *Flying J., Inc.*, 855 N.E.2d at 1042 (quoting and citing the Record). Clark County, however, adopted a different definition of "accessory use" than the one discussed in *Flying J.* Pursuant to the CCZO, an "Accessory Use and Structure" is:

> One which (a) is subordinate to and serves a principal building or use; (b) is subordinate in area, extent or purpose to the principal building or use served; (c) contributes to the comfort, convenience or necessity of occupants of the principal building or use serve[d]; and (d) is located on the same lot as the principal building or use served with the single exception of such accessory off-street parking facilities as are permitted to locate elsewhere than on the same lot with the building or use served.

(App. Vol. III at 12.) Essroc has not explained whether or how burning LWDF to produce cement would qualify as an accessory use under the CCZO's definition. As such, this argument is waived. *See Kentucky Nat. Ins. Co.*, 919 N.E.2d at 586 (failure to cite relevant authority and develop argument results in waiver). This oversight has not impacted our decision however because, as explained further herein, the "[s]torage processing and recycling of hazardous materials" is permitted only in the M3 district. (App. Vol. III at 49.)

[8] We accordingly need not address the CCBZA's argument that no accessory uses are permitted in the M2 district because the CCZO lists accessory uses as a permitted use in every zoning district except M2 and M3. (*See* CCBZA Br. at 26.)

---

*Brandmaier v. Metro. Dev. Comm'n of Marion Cty.*, 714 N.E.2d 179, 180-81 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*.

[26]   The CCZO provides the storage, processing, and recycling of hazardous wastes is a use allowed in only the M3 district. As such, it cannot be permitted in any other zoning district. *See*, *e.g.*, *id.* (where sale of fireworks explicitly permitted in C-4 zone, court would not infer that sale of fireworks was permitted in a C-3 district that permits "development of a complete range of retail sales").

### III.   Does Plan Commission staff have the authority to revoke a prior staff-issued, non-public, informal zoning determination letter by sending another staff-issued, non-public, zoning determination letter?

[27]   The powers of a zoning board are limited strictly to those provided in the authorizing statute, *Flat Rock Wind*, 70 N.E.3d at 858, and zoning boards are "required to follow the provisions of a zoning ordinance." *Flying J., Inc.*, 855 N.E.2d at 1042. Whenever there is doubt about whether an agency has a power, the doubt must be resolved against the agency. *State ex rel. ANR Pipeline Co. v. Indiana Dept. of State Revenue*, 672 N.E.2d 91, 94 (Ind. T.C. 1996) (hereinafter "*ANR Pipeline*"). Any act by a zoning board that exceeds its enumerated powers is "*ultra vires* and void." *Flat Rock Wind*, 70 N.E.3d at 858 (italics in original).

[28]   Article III of the CCZO states: "It is the intent of this Ordinance that all questions of interpretation shall be first presented to the staff. Appeals of staff decisions interpreting this Ordinance may be presented to the Board of Zoning

Appeals as provided for in Article XXII [sic]."[9] (App. Vol. III at 170.) The CCZO also defines the authority provided to staff:

> The staff is authorized to take those lawful actions necessary to enforce the terms of this Ordinance on behalf of the Plan Commission and Board of Zoning Appeals. The staff shall also have the authority to perform inspections, to review applications, and to issue permits. The [s]taff is authorized to make inspections of all lands located in the jurisdiction of the Plan Commission or to enforce the provisions of this Ordinance. In order to execute inspections, the staff shall have the right to enter any premises at any reasonable time for the purpose of carrying out their duties in the enforcement of this Ordinance. The staff is authorized to take any action authorized under Indiana Code IC [sic] 36-7-4 et seq. to correct such violations.

(*Id*. at 169.)

[29] In 1926, our Indiana Supreme Court held "power to undo an act once done will not be implied from the mere grant of power, in the exercise of a sound discretion, to do the act." *Cress v. State*, 198 Ind. 323, 333-34, 152 N.E. 822, 826 (1926). Accordingly, unless the legislature has given clear authority to revoke final determinations, administrative bodies do not have the power to change their minds after a final determination. *See ANR Pipeline*, 672 N.E.2d at 94

---

[9] Article XXII of the CCZO outlines the purpose and proceedings required to obtain a "special use" classification. (*See* App. Vol. III at 62-7.) Such classifications must be presented to the CCBZA, which "shall approve or deny all special uses." (*Id*. at 62.) The appeal process for staff decisions is found instead in Article XXI. (*See id*. at 60-1) ("The Board of Zoning Appeals shall approve or deny all . . . [a]ppeals from staff decisions.").

("administrative bodies may not usually rescind their final determination absent some statutory provision granting that authority").

> This rule is not absolute, however, for "when an administrative agency recognizes its own error of law, it may correct that error." A mistake of law occurs when "a party, having full knowledge of the facts, comes to an erroneous conclusion as to their legal effect." Thus, in order to show an error of law occurred . . . , [the agency] must cite to a statute, legal principle, or change in case law that was neglected or misapplied to the facts.

*Id*. (internal citations omitted).

[30]     For example, in *ANR Pipeline*, ANR Pipeline petitioned the Indiana Department of State Revenue asking permission to file amended tax returns to recalculate its tax liability based on a "combined basis" rather than the "separate company filing method." *Id*. at 92. On May 15, 1989, the Department granted ANR Pipeline's petition, so ANR Pipeline filed amended returns. *Id*. The Department, however, rejected the amended returns, stating the combined basis method was inappropriate. *Id*. ANR Pipeline appealed, and the Department held a hearing. *Id*. The Department then issued a Letter of Findings ("First LOF") on December 7, 1993, sustaining ANR Pipeline's protest and giving ANR Pipeline permission to file the amended return using the combined basis method. *Id*. However, on November 7, 1994, the Department issued a second Letter of Findings ("Second LOF") in which it asserted it was revoking the First LOF because of a "mistake of law." *Id*. at 93.

ANR Pipeline appealed to the Indiana Tax Court, arguing the Department did not have the authority to revoke its First LOF. The Department asserted it could revoke the First LOF because, as the Second LOF stated, the First LOF contained an error of law.[10] *Id*. at 94. The Tax Court reviewed the record and determined the Second LOF had not reversed the First LOF based on an error of law:

> [T]he second LOF states on its face that its purpose was to revoke the first LOF "as it relates to the finding that the entire Costal group may file retroactive combined returns for the years 1986 and 1987 . . . based upon a mistake of law." Second LOF at 1. However, the Department's reasoning in the second LOF belies this characterization. The first LOF granted ANR [Pipeline] the right to file amended combined/unitary returns pursuant to IND.CODE ANN. § 6-3-2-2(q). The second LOF did not address [that statute] and whether the law was properly interpreted and applied in this instance. Rather, the second LOF focused on two issues: first, Indiana does not statutorily guarantee taxpayers the right to file amended returns, and second, amended returns are inappropriate, under federal law, where the taxpayer has already selected a valid method of taxation but attempts to change to an alternative method merely to minimize taxes. *Such a change in reasoning does not constitute an error of law and does not justify the alteration of a final administrative decision.*

---

[10] The Department also asserted the First LOF could be revoked because it was not a final determination. The Tax Court held: "The first LOF was a proper exercise of the Department's authority pursuant to IND.CODE ANN. § 6-8.1-5-1(b) (1989) and constitutes a final determination by the Department." *ANR Pipeline*, 672 N.E.2d at 94. Herein, we need not determine whether an informal decision by Plan Commission staff is a final determination because the first letter issued to Essroc was incorrect as a matter of law.

*Id*. at 94-5 (emphasis added). Thus, for the Department to have the authority to reverse a final determination, the reversal must be required by an actual error of law, not simply a change of reasoning. *See id*. at 95.

[32] Here, in contrast, Plan Commission staff revoked the first letter to Essroc based on an actual error of law. In the first letter, staff concluded: "Essroc's use of such alternative fuels will not require a rezoning to M3 (Hazardous Waste Disposal District) for any portion of its facilities or the grant of any use variance." (App. Vol. II at 61.) In the second letter, staff concluded that "in order to add the uses which are the subject of IDEM approval [hazardous waste storage and treatment facility], Essroc must file for rezoning to an M-3 zone and/or file for a variance prior to any such use at its Speed facility."[11] (*Id.* at 127.) When Essroc appealed that decision to the CCBZA, the CCBZA found and concluded:

> 5.      On January 26, 2015, without a public hearing and/or public meeting, but apparently in a meeting with Essroc

---

[11] The parties disagree whether Plan Commission staff's first letter was erroneous because of alleged misrepresentations made to staff when Essroc requested the first letter. As Judge Mathias acknowledged during oral argument, Essroc's original letter to the Plan Commission requesting certification of zoning compliance for the switch to LWDF contained language sufficiently vague to permit an inference that LWDF were not Hazardous Waste. (*See* App. Vol. II at 53) (stating the "alternative fuels . . . would be flammable (as required to create heat for the kiln), and would be accordingly designated as 'hazardous' due to such flammability"). Counsel for Essroc pointed to statements at the CCBZA hearing that suggested the Plan Commission staff had accurate facts when the Plan Commission staff issued the first letter. (*See* App. Vol. III at 184) ("they are claiming here tonight they are doing exactly what they told us the first night"). However, the record before us includes neither the packet of materials that Essroc allegedly provided to the Plan Commission at their informal meeting in early January 2015 nor a transcript of (or an agreed statement of facts regarding) the discussions that occurred that day. We accordingly decline to speculate whether the Plan Commission's original error of law was based on accurate or inaccurate facts. Furthermore, under the legal standard set out in *ANR Pipeline*, we are concerned only with whether the Plan Commission made an error of law, not with *why* that erroneous decision might have been made.

on January 22, 2015, the then Executive Director of the Clark County Plan Commission, Michael Tackett issued a determination that Essroc Cement was able to, as a matter of right, burn regulated liquid waste-derived fuel at its location without a zoning change and/or a zoning variance from its M2 zoning district (the "Interpretation").

6. The "M2 (Heavy Industrial)" in the Ordinance does not allow the destruction or recycling [or] the burning of hazardous waste.

* * * * *

8. Pursuant to the Ordinance the only zoning district in Clark County, Indiana allowing the burning of hazardous waste is an "M3 Hazardous Waste Disposal District" in Clark County, Indiana, and the same is described in Article XVII of the Ordinance.

* * * * *

18. The Interpretation by the then Executive Director was improper, incorrect[,] and as the intended use by Essroc, according to its own filing with the Indiana Department of Environmental Management ("IDEM") for a RCRA Permit (VFC#80012744) its new intended use [sic] stated it as a "Hazardous Waste Storage Facility; Hazardous Waste Treatment Facility."

19. Essroc in February of 2015 also applied to modify (significantly) it [sic] Part 70 Operation Permit ("Title V Permit") to begin utilizing LWDF. The preliminary findings of IDEM conclude that Essroc will construct a RCRA LWDF waste receiving and storage facility at it [sic] Real Estate.

20.     The proposed use by Essroc is a prohibited use in an M2 zoning district in Clark County, Indiana.

21.     The Determination should be affirmed in all respects requiring Essroc to file a Petition for Rezoning the Real Estate or a Petition for a Use [V]ariance for its intended uses which are the subject of the IDEM approval.

(*Id*. at 186, 188.)

[33]     The CCBZA correctly determined Essroc's proposal to receive, store, process, and burn LWDF Hazardous Waste could be permitted only on land zoned M3 under the CCZO.  *See supra* Issue I.  Accordingly, the Plan Commission staff's first letter to Essroc was erroneous as a matter of law.  Staff therefore had the authority to correct its earlier, legally erroneous decision.  *See, e.g.*, *Civil City of Indianapolis v. Ostrom Realty & Const. Co.*, 95 Ind. App. 376, 176 N.E. 246, 248 (1931) ("Building permits or licenses issued by the city controller have no force and effect to authorize the construction of a building contrary to the ordinance.").

### IV.  *If Plan Commission staff could revoke the initial staff determination, was Essroc entitled to notice and a public hearing before that revocation?*

[34]     Essroc asserts it was entitled to notice and a public hearing before Plan Commission staff could issue a new staff determination that revoked the prior staff determination.  In support, Essroc cites *Schlehuser v. City of Seymour*, 674 N.E.2d 1009, 1014 (Ind. Ct. App. 1996), which held a board of zoning appeals ("BZA")

had the implied authority to revoke Schlehuser's variances if they were granted subject to reasonable and clearly stated conditions of approval and if Schlehuser then failed to meet those conditions. However, even in this circumstance, Schlehuser was entitled to notice and an opportunity to be heard.

*Id*. at 1014. As the CCBZA argues, however, Essroc is misapplying *Schlehuser*.

[35] *Schlehuser* involved the revocation of variances that had been approved by a local BZA. As the application process for variances generally requires a public hearing before a BZA, during which evidence and argument are presented, (*see, e.g.*, App. Vol. III at 60) (providing hearing for variance), then, as we held in *Schlehuser*, subsequent action by a BZA as to those same variances ought also require notice and an opportunity to be heard. *See Schlehuser*, 674 N.E.2d at 1014.

[36] Here, though, Essroc was not complaining about a subsequent action by the CCBZA, whose rules require public hearing following notice. (*See id*. at 60) (providing Board must set public hearing for appeals of staff decisions). Essroc instead is arguing about subsequent action by Plan Commission staff. Essroc has not pointed to any section of the CCZO, nor could we find one, that requires public notice or a hearing before Plan Commission staff produce an opinion letter. (*See generally* App. Vol. III at 7-10) (explaining the administration of the CCZO). As staff opinions are produced without public hearing following notice, Essroc has not demonstrated error in staff's issuance of the second letter without a public hearing or notice.

### *V. Is the CCBZA equitably estopped from requiring Essroc to rezone because Essroc spent money in reliance on the first determination letter?*

[37]     Essroc argues the CCBZA should be equitably estopped from requiring Essroc to obtain a variance or to re-zone its property because "Essroc had expended in excess of $1.2 million in reliance on" the Plan Commission's original zoning determination letter. (Br. of Appellant at 36 n.6.) The CCBZA argues Essroc waived this argument by failing to raise it before the Board.

[38]     "[A] person may obtain judicial review only of an issue that was raised before the administrative agency, with two very limited exceptions . . . ." *Roman Marblene Co., Inc. v. Baker*, 88 N.E.3d 1090, 1098 (Ind. Ct. App. 2017) (citing Ind. Code § 4-21.5-5-10), *trans. denied*. Those two exceptions are:

> (1) the issue concerns whether a person who was required to be notified by this article of the commencement of a proceeding was notified in substantial compliance with this article; or

> (2) the interests of justice would be served by judicial resolution of an issue arising from a change in controlling law occurring after the agency action.

Ind. Code § 4-21.5-5-10. As Essroc's estoppel argument does not assert a failure to notify a required party or a recent change in controlling law, Essroc cannot raise this issue during judicial review of the CCBZA's decision.[12] *See, e.g.,*

---

[12] Had this issue not been waived, "[e]stoppel is not generally applicable against government entitles for the actions of public officials." *Barnett v. U.S. Architects, LLP*, 15 N.E.3d 1, 10 (Ind. Ct. App. 2014) (quoting *Biddle v. BAA Indianapolis, LLC*, 860 N.E.2d 570, 581 (Ind. 2007)), *reh'g denied*. There are two reasons for this

*Indiana Educ. Emp't Relations Bd. v. Tucker*, 676 N.E.2d 773, 776-7 (Ind. Ct. App. 1997) (appellant could not raise impartiality of administrative board for first time on appeal; issue waived for failure to raise before administrative agency).

### VI. Should Finding 18, Finding 19, and Conclusion 7 be struck from the trial court's final order because the issue of whether the CCZO is preempted by federal law was not before the trial court?

[39]     The trial court entered two findings and one conclusion regarding whether the CCZO's M3 district is preempted by federal law.[13]  All parties seem to agree the

_____

rule.  First, "[i]f the government could be estopped, then dishonest, incompetent or negligent public officials could damage the interests of the public."  *Id*. (quoting *Samplawski v. City of Portage*, 512 N.E.2d 456, 459 (Ind. Ct. App. 1987)).  Second, "if the government were bound by its employees' unauthorized representations, then government, itself, could be precluded from functioning."  *Id*. (quoting *Samplawski*, 512 N.E.2d at 459).

[13] The trial court's original findings and conclusion provided:

> 18.      That Essroc in its Verified Petition (Paragraph 28) waived its rights to argue that the Clark County zoning ordinance zoning classification M3 Hazardous Waste Disposal District is preempted by RCRA.

> 19.      That the Clark County zoning ordinance, I.C. 36-7-4-918.4 (use variance) and I.C. 36-7-4-918.5 (developmental variance) all have a basis in public health, safety, morals and general welfare of the community and therefore are not in derogation of federal RCRA law.

> * * * * *

> 7.      The Clark County Zoning Ordinance, I.C. 36-7-4-918.5 and I.C. 36-7-4-918.4 are not preempted by Federal RCRA law as each has a basis in human health or environmental protections.

(App. Vol. IV at 97, 98.)  In the order granting Essroc's motion to correct error, the trial court modified finding 18 to read:

> That Essroc in its verified Petition (paragraph 28) initially waived its right to argue that the Clark County Zoning Ordinance, zoning classification M3 Hazardous Waste Disposal District is preempted by RCRA, however, such issue was tried by consent of the parties by Essroc arguing that issue in the BZA hearing and by Essroc fully briefing the issue in Article VI of it's [sic] Brief, responded to and briefed by the BZA in Article IV of it's [sic] Brief in support of its Cross-Motion for Summary Judgment.

(*Id*. at 130.)

issue could not have been raised in the trial court during judicial review of the CCBZA's decision because the issue had not been raised before the CCBZA. Nevertheless, CCBZA and Sierra Club assert we should address this issue because it was raised by Essroc and addressed by the trial court.

[40] As we discussed above, issues can be raised for the first time during judicial appeal from an administrative decision only if one of two exceptions is asserted:

> (1) the issue concerns whether a person who was required to be notified by this article of the commencement of a proceeding was notified in substantial compliance with this article; or

> (2) the interests of justice would be served by judicial resolution of an issue arising from a change in controlling law occurring after the agency action.

Ind. Code § 4-21.5-5-10. The federal preemption issue does not arise from a change in controlling law that occurred after the CCBZA's decision, and thus neither the trial court nor we can address that issue, which was not presented to the administrative board. *See*, *e.g.*, *Tucker*, 676 N.E.2d at 776-7 (appellant could not raise impartiality of administrative board for first time on appeal; issue waived for failure to raise before administrative agency). The trial court erred when it entered these findings and conclusion.

# Conclusion

[41] The CCBZA correctly determined the CCZO permits the storage, processing, and recycling of hazardous waste as alternative fuel for production only in the

M3 zoning district. Accordingly, such activity is not available as an accessory use in the M2 zoning district. Because the first letter sent to Essroc was legally erroneous, Plan Commission staff had the authority to revoke that letter with a new letter that corrected its original error of law, and Essroc was not entitled to notice and a public hearing before that second letter was issued. As neither equitable estoppel nor federal preemption were raised before the CCBZA, those issues are unavailable during judicial review of the CCBZA's decision. As all of Essroc's assertions of CCB2A error fail, we affirm the decision of the CCBZA.

[42] Affirmed.

Riley, J., and Mathias, J., concur.